UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **THE CHEROKEE NATION,**<br><br>Plaintiff,<br><br>v.<br><br>**UNITED STATES DEPARTMENT OF THE INTERIOR,** *et al.*,<br><br>Defendants. | Civil Action No.<br>19-cv-2154-TNM-ZMF |

### MEMORANDUM OPINION

An accounting is long overdue of the United States' failure to uphold its "moral obligations of the highest responsibility and trust" to the Cherokee Nation (the "Nation"). *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 176 (2011) (quoting *Seminole Nation v. United States*, 316 U.S. 286, 297 (1942)). For centuries, the United States has held assets belonging to Plaintiff, the Nation, in a trust. The Nation has sued for an accounting of its trust funds from the Department of the Interior and other federal defendants (collectively, the "Government"). Judge McFadden referred this matter to a magistrate judge for full case management, including discovery, pursuant to Local Civil Rule 72.2. *See* Minute Order, Feb. 18, 2020. The Government then filed a Motion for a Protective Order seeking to limit discovery "to the administrative record and [to] prohibit[] traditional civil discovery." ECF No. 55 (Def.'s MPO) at 1. The Court now DENIES that motion.

I. **BACKGROUND**

The Nation filed their Complaint against the Government on July 19, 2019, seeking a declaratory judgment and injunctive relief. *See* ECF No. 1 (Compl.), ¶¶ 131–167. "[T]he Nation

1

[is] invok[ing] its right to an accounting of the Trust Fund as a beneficiary of the Government's trusteeship." *Id.*, ¶ 3. Count I "seeks an order from this Court compelling the [Government] to provide an accounting," because such an "accounting has not been provided," and it claims that this failure "constitutes an illegal deprivation of the Nation's interests." *Id.*, ¶¶ 134, 137. As the basis for this Count, the Nation cites Presidential Proclamations, "various . . . treaties, other agreements, and . . . congressional or administrative acts" dating back to 1785 that the Nation contends create a trust relationship. *Id.*, ¶ 132, 135–36 (cleaned up).

Count II also seeks an accounting, *see id.* at 44, but its foundation is more precise. It is rooted in the accounting provisions set forth in the American Indian Trust Fund Management Reform Act of 1994 (the "1994 Act")—specifically 25 U.S.C. §§ 4011, 4044, and 162a. *See id.*, ¶¶ 140–42, 144. The Nation alleges that the Government "has failed to provide . . . any of the accounting required by 25 U.S.C. § 4011 and 25 U.S.C. § 4044." *Id.*, ¶ 141. Over the course of eight paragraphs, the Nation lists specific obligations that the Government "has not" fulfilled. *Id.*, ¶¶ 145–52. In light of these alleged failures, the Nation seeks an injunction requiring the Government to, *inter alia*, "[p]rovide the Nation with as full and complete an accounting as possible of the Nation's funds, assets[,] and natural resources to the earliest possible date." *Id.*, ¶ 154(1).

Count III again seeks an accounting, but this time under the Administrative Procedure Act ("APA"). *See id.* at 47. This Count also lists several obligations that the Government "has not" fulfilled, *id.* ¶ 156–64, including that it "has not provided the Nation with as full and complete an accounting as possible of the Nation's funds to the earliest possible date." *Id.*, ¶ 164. Without specifically identifying the statutory standard of review for this APA claim, the Nation alleges that

the Government "has acted arbitrarily[] and capriciously, and such action constitutes final agency action and the withholding of agency action." *Id.*, ¶ 166.

The Court subsequently issued a discovery scheduling order requiring the parties to serve initial disclosures by April 13, 2020, commence propounding discovery by April 20, 2020, and file any motions for a protective order by May 20, 2020. *See* ECF No. 49. On April 13, 2020, the Government served the Nation with its "initial disclosures and administrative record." *See* ECF No. 52 (Certificate of Service). The Government then filed a 320-page Index identifying each document in the administrative record. *See* ECF No. 53 (AR Index). The full administrative record consists of a stunning 113,655 pages. *See* Def.'s MPO at 5; AR Index at 321. It includes the Nation-specific "reconciliation reports . . . dating from 1973 through 1997; annual audit reports . . . dating from 1997 through 2008; and periodic statements of performance for the Tribe's assets . . . dating from 1996 to September 30, 2019." *See* Def.'s MPO at 5. According to the Government, "the administrative record . . . evidences the accounting provided to [the Nation] as required by law." *Id.* at 4. This administrative record is entirely comprised of documents collected during the Bureau of Indian Affairs' Trust Reconciliation Project ("TRP"). *See id.* at 4–5; ECF No. 58 (Initial Scheduling Conference Tr.), 8:1–9.

As much of the parties' current dispute hinges on the weight of the TRP reports, some background is necessary:

> In 1991, [the Department of the Interior] contracted with the accounting firm Arthur Andersen to reconcile 'all Tribal . . . trust fund accounts' as part of the [TRP] . . . . After a series of false starts and reality checks, the project was modified and re-modified until the parties ultimately agreed that it would encompass the following tasks: (1) basic reconciliation or verification of all the tribal trust transactions for the years 1972-1992; (2) investment yield analysis; (3) Treasury interest analysis to reconcile the interest on cash balances; (4) a reconciliation of the disparities in accounts reported by multiple recording systems; (5) a 'fill the gap' procedure

3

> conducted for a limited number of trust accounts (not intended to be representative of the whole) that attempted to verify selected receipts to lease agreements and other money making contracts; (6) an analytical review to track any unusual fluctuations in receipts and disbursement in the fiscal years 1978 through 1992; (7) a 'pro forma' procedure by which the tribes could be provided with a 'purely hypothetical calculation' of their accounts that did 'not requir[e] a correction/adjustment to the accounts;' and (8) the summarization of the 'time between the apparent receipt date of collections to the deposit date posted in the tribes' trust accounts,' again, to be used for purely informational purposes."

*Nez Perce Tribe v. Kempthorne*, No 06-cv-2239, 2008 WL 11408458, at *2 (D.D.C. Dec. 1, 2008). The resulting report ("Andersen Report") was a "five-year project [that] covered transactions for the twenty-year period from 1972 to 1992, and cost $21 million to complete." Press Release, Department of the Interior, Office of the Secretary, *Background of the Tribal Trust Funds Reconciliation Project and Proposed Settlement Options*, 1996 WL 719226 (Dec. 1996). The Andersen Report concluded that, of the transactions surveyed, "14 percent of transactions—amounting to $2.4 billion—were deemed . . . to be 'unreconciled,' meaning that the Office of Trust Funds Management . . . was unable to locate source documents during the course of the project to support the accuracy of the general ledger entry for the transactions."[1] *Id.*

---

[1] This lapse is astonishing. The government's mealy mouthed retort is "[w]hile this does not mean that the $2.4 billion is lost or missing, it does mean that the poor condition of the records and systems did not allow the federal government to conduct an audit or provide the level of assurance to account holders that should be expected." Press Release, Department of the Interior, Office of the Secretary, *Background of the Tribal Trust Funds Reconciliation Project and Proposed Settlement Options*, 1996 WL 719226 (Dec. 1996).

A student with an 86% score receives a B+ in school, but a trustee who can only account for 86% of a trust receives a F grade. Worse yet, in the Government's "relationships with Indians, [] its conduct 'should [] be judged by the most exacting fiduciary standards.'" *Cobell v. Norton*, 240 F.3d 1081, 1099 (D.C. Cir. 2001) (*Cobell VI*) (quoting *Seminole Nation v. United States*, 316 U.S. 286, 297 (1942)).

At a minimum, this is just one example of the woeful inadequacy of the Andersen Report (discussed further below). The bigger question is what the remedy is for such failure. Normally,

On April 20, 2020—after receiving the administrative record—the Nation served the Government with sixteen Requests for Production ("RFP"). *See* Def.'s MPO, Exh. 1 (Pl.'s RFPs) at 5–7. In summary, the RFPs broadly request all audits, account statements, and other documents that concern the Nation's trust accounts and financial transactions involving the Nation's funds and resources dating back to 1785. *See id.*; Compl., ¶ 18. The Nation made three requests that do not fall in the circle of financial documents: RFP Number 4 requests "[a]ll documents concerning the United States' appointment of principal chiefs of the Cherokee Nation"; RFP Number 15 requests "[a]ll transcripts of testimony related to the trust reconciliation process that resulted in the Arthur Andersen tribal reconciliation reports"; and RFP Number 16 requests "[a]ll transcripts of testimony by any of the Defendants" related to general trust management matters. *See id.* at 6–7. Shortly thereafter, the Government filed a Motion for a Protective Order asking this Court to bar the Nation's RFPs, prohibit traditional civil discovery, and limit its review to the evidence presented in the administrative record. *See* Def.'s MPO at 1.

## II.     LEGAL STANDARD

Generally, a party may seek discovery as to any matter that is "relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). A party from whom discovery is sought may move for a protective order to forbid discovery or "limit the scope of . . . discovery to certain matters." Fed. R. Civ. P. 26(c)(1)(A), (D). "The court may, for good cause, issue an order to protect a party . . . from annoyance . . . or undue burden or expense." Fed. R. Civ. P. 26(c)(1). "Generally, the party moving for a protective order under [Rule] 26(c) bears

---

"[w]hen a trustee commits a breach of trust, the trustee is personally liable to the trust's beneficiaries." *In re Cannon*, 277 F.3d 838, 854 (6th Cir. 2002).

5

the burden of establishing good cause for the entry of the protective order." *Cobell v. Norton*, 226 F.R.D. 67, 92 (D.D.C. 2005) (*Cobell XIV*).

The APA sets its own limits on the scope of discovery for claims seeking review of agency actions or inactions. The "APA[] provides that the reviewing court is to evaluate agency action by 'review[ing] the whole record or those parts of it cited by a party.'" *Nat'l Wilderness Inst. v. U.S. Army Corp of Eng'rs*, No. 01-cv-0273, 2002 WL 34724414, at *3 (D.D.C. Oct. 9, 2002) (quoting 5 U.S.C. § 706(2)). "The agency must set forth the entire record, which includes all materials directly or indirectly relied on to make all decisions, not just final decisions." *Id.* (citing *AMFAC Resorts, LLC v. Dep't of the Interior*, 143 F. Supp. 2d 7, 10 (D.D.C. 2001)). "It is well settled that judicial review of agency action is normally confined to the full administrative record before the agency at the time the decision was made." *Env't Def. Fund v. Costle*, 657 F.2d 275, 284 (D.C. Cir. 1981). This Circuit has barred parties from supplementing the administrative record "unless they can demonstrate unusual circumstances justifying a departure from this general rule." *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008) (quoting *Tex. Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 940 F.2d 685, 698 (D.C. Cir. 1991)).

### III.    ANALYSIS

The Court will approach the Government's Motion in three steps. *First*, which of the Nation's claims are brought under the APA? *Second*, for any claims brought under the APA, should the Court extend discovery beyond the administrative record? And, *third*, if it is proper to allow such discovery, what is the proper scope of that discovery?

#### A.    Basis of Claims

The parties hold vastly different understandings of the APA's role in this litigation. The confusion is understandable, as the APA wears many hats. *First*, the APA plays a jurisdictional

6

role.  In denying the Government's first Motion to Dismiss, this Court determined that the Government waived sovereign immunity as to each of the Nation's claims under § 702 of the APA. *See Cherokee Nation v. Dep't of the Interior*, No. 19-cv-2154, 2020 WL 224486, at *2 (D.D.C. Jan. 15, 2020).  *Second*, the APA undisputedly provides the statutory cause of action for the Nation's third count, entitled "Accounting as an [APA] Claim."  Compl. at 47.  The parties' agreement ends there.

The Government opines that "[a]lthough [the Nation] contends that only Count 3 is an APA claim . . . the APA provides the basis for this Court's review" as to each Count.  Def.'s MPO at 10.  To support this interpretation, the Government points out that (1) all three Counts seek the same relief—an accounting, *see id.*, and (2) because § 702 of the APA provides the waiver of sovereign immunity as to all Counts, the APA's standards of review—outlined in § 706—govern each claim, *see id.* at 11.  If the Government's interpretation is correct—which it is not—then this Court's review is limited to the administrative record pursuant to the APA.  *See Env't Def. Fund*, 657 F.2d at 294.

The Nation responds that its first two claims "are not dependent upon the APA," and it takes issue with the Government's "attempts to pigeon hold this as a one-size-fits-all APA case." Pl.'s Opp'n at 2.  Rather, the Nation posits that Counts I and II "claim violations of the [Government's] trust responsibilities that arise from the special trust relationship that the United States has asserted over Indian tribes, and which are grounded in federal law."  *Id.* at 3.

The Court can easily dispense of one of these arguments—indeed, it already has in this very case.  "[T]he Government's waiver of immunity applies not only to the Nation's APA claim, but to its other claims as well, because the 'APA's waiver of sovereign immunity applies to any suit whether under the APA or not.'"  *Cherokee Nation*, 2020 WL 224486, at *2 (quoting *Chamber*

*of Com. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996)).  But that does not resolve the overarching question of the source of the Nation's claims.

The Complaint identifies numerous treaties, statutes, and presidential proclamations that outline the trust relationship between the Nation and the Government.  *See generally* Report & Recommendation, *Cherokee Nation v. Dep't of the Interior*, No. 19-cv-2154 (D.D.C. Jan. 4, 2021), ECF No. 68 at 1–3 (adopted in full, ECF No. 70).  The Nation has not clearly stated whether these federal laws provide independent causes of action, or whether they merely provide the statutory standard by which the Court should review agency action under the APA.  On the one hand, the APA provides a cause of action to those "suffering legal wrong because of agency action [or inaction], or [who are] adversely affected or aggrieved by agency action [or inaction] within the meaning *of a relevant statute*."  5 U.S.C. § 702 (emphasis added); *see also* 5 U.S.C. § 551(13).  Thus, the APA *could* provide the basis for judicial review of any claim alleging the Government's failure to comply with specific statutes—including those listed in Counts I and II.  *See Cobell v. Babbitt*, 91 F. Supp. 2d 1, 24 (D.D.C. 1999) (*Cobell V*) ("Plaintiffs' statutorily-based claims against the government," including those under 25 U.S.C. § 162(d), "can be brought under the APA") (citing *Rockbridge v. Lincoln*, 449 F.2d 567, 573 (9th Cir. 1971)).

The Tenth Circuit refined this generic-APA analysis and concluded in a similar tribal accounting case that if a statute requires the Government to account for trust funds, then "[t]he beneficiary of a trust can maintain a suit to compel the trustee to perform [its] duties as trustee." *Fletcher v. United States*, 730 F.3d 1206, 1210 (10th Cir. 2013) (quoting Restatement (Second) of Trusts § 199 cmt. A)).  "[W]hile we are always cautious about assuming a statute grants a privately enforceable right, within the narrow field of Native American trust relations statutory ambiguities must be 'resolved in favor of the Indians.'"  *Id.* (quoting *Bryan v. Itasca Cnty.*, 426 U.S. 373, 392

(1976)). "[W]hen it comes to statutes involving Native Americans, they 'need not explicitly provide' a private right of action." *Id.* at 1211 (quoting *United States v. Navajo Nation*, 556 U.S. 287, 290 (2009)). By enacting the 1994 Act, "Congress has chosen to afford . . . the statutory right to seek and obtain an accounting." *Id.* at 1210. This Court adopts *Fletcher*'s conclusion and finds that the 1994 Act provides a cause of action wholly apart from the APA review process. Thus, Count II sits outside of the APA.

Yet, the Court cannot make similar conclusions as to Count I, which cites a litany of statutes, treaties, and presidential proclamations as the basis of the claim. *See* Compl., ¶¶ 132–37. Indeed, Count I merely lists "example[s]" of statutes supporting its claim. *See id.*, ¶¶ 135 n.6, 136. Without knowing the precise statutory basis (or bases) for this claim, the Court cannot say whether the APA has a role to play or not. However, for the reasons discussed below, the Nation is entitled to discovery beyond the administrative record for each claim, whether or not the claim fits neatly into the APA box.

      B.      <u>Administrative Record Review</u>

           i.      <u>Legal Framework for APA Review</u>

For claims arising under the APA, "the focal point of this court's APA review 'should be the administrative record already in existence, not some new record made initially in the reviewing court.'" *Cobell V*, 91 F. Supp. 2d at 37 (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973)). "There are however exceptions to the rule limiting judicial review" to the administrative record. *Nat'l Wilderness Inst.*, 2002 WL 34724414, at *3. This includes "in cases where agencies are sued for a failure to take action," "when the agency failed to consider factors that are relevant to its final decision," and "when a case is so complex that a court needs more evidence to enable it to understand the issues clearly." *Id.* (citing *AMFAC*, 143 F. Supp. 2d at 10; *Esch v. Yeutter*, 876

F.2d 976, 991–92 (D.C. Cir. 1989)).  Ordinarily, "the party seeking further evidence must make a 'strong, substantial, or prima facie showing'" that an exception applies.  *Id.* at *4 (quoting *AMFAC*, 143 F. Supp. 2d at 12).  But, in cases involving the rights of Native Americans, the Court must always keep in mind that "[t]he governing canon of construction requires that 'statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit.'" *Cobell v. Norton*, 240 F.3d 1081, 1101 (D.C. Cir. 2001) (*Cobell VI*) (quoting *Montana v. Blackfoot Tribe of Indians*, 471 U.S. 759, 766 (1985)).

The Government's request to limit discovery to the administrative record rests on the erroneous assumption "that this is, in fact, a typical APA case involving judicial review of final agency action and no more."  *Cobell XIV*, 226 F.R.D. at 92. But it "confuse[s] a challenge to final agency action and a challenge to an agency's failure to act."  *Nat'l Law Ctr. on Homelessness & Poverty v. Dep't of Veterans Affairs*, 842 F. Supp. 2d 127, 130 (D.D.C. 2012).  "This premise is ill-founded and the [Government's] argument is ultimately unsound."  *Cobell XIV*, 226 F.R.D. at 92 (cleaned up).  "[I]n a challenge to final agency *action*, judicial review is ordinarily limited to the administrative record in existence at the time of the agency's decision."  *Nat'l Law Ctr. on Homelessness & Poverty*, 842 F. Supp. 2d at 130 (citing *Aguayo v. Hervey*, 476 F.3d 971, 976 (D.C. Cir. 2007)) (emphasis added).  "[B]ut that is not the case in a challenge to an agency's *failure to act*."  *W. Watersheds Project v. Pool*, 942 F. Supp. 2d 93, 100–01 (D.D.C. 2013) (citing *Aguayo v. Harvey*, 476 F.3d 971, 976 (D.C. Cir. 2007)) (emphasis added). [2]

---

[2] There is some disagreement in non-Native American cases on the applicability of the failure to act exception.  *See Dallas Safari Club v. Bernhardt*, No. 19-cv-3696, 2021 WL 495078, at *2 (D.D.C. Feb. 9, 2021) ("The better reading of the APA is that its record review requirement 'applies [regardless of] whether a court is reviewing agency action or inaction.'" (quoting *Biodiversity Legal Foundation v. Norton*, 180 F. Supp. 2d 7, 10 (D.D.C. 2001))).  But even cases rejecting the failure to act exception recognize that "there are some failure-to-act cases where, as a practical matter, judicial review is difficult, if not impossible absent extra-record evidence."  *Id.*

10

The Government contends that the Andersen Report constitutes a final agency action that provided a full accounting as required by law. *See* Def.'s MPO at 4–5, 11. And in turn, that the standard of review is whether this claimed accounting was "arbitrary and capricious or otherwise not in accordance with law." Def.'s MPO at 11; *see also* 5 U.S.C. § 706(2)(A) (allowing courts "to hold unlawful and set aside agency *action*" under certain circumstances (emphasis added)).

The thrust of the Nation's APA claim is that "no final agency action exists" because the Government "unlawfully withheld" a full and complete historical accounting.[3] *Cobell V*, 91 F. Supp. 2d at 37 (quoting 5 U.S.C. § 706(1)). "Judicial review of agency *inaction*, on the other hand, is governed by a different standard . . . 5 U.S.C. § 706(1) . . . [which] provides that the reviewing court shall . . . compel agency action unlawfully withheld." *Env't Def. Fund*, 657 F.2d at 283. Review under this section is not limited to the administrative record. *See W. Watersheds Project v. Pool*, 942 F. Supp. 2d at 100–01.

ii.   § 706(1) Is the Appropriate Standard Here

For too long, the Government has unlawfully withheld an adequate—let alone a comprehensive—audit. The Andersen Report "was not an audit." *Cobell v. Kempthorne*, 532 F. Supp. 2d 37, 52 (D.D.C. 2008) (*Cobell XX*). Indeed, the Government previously provided documents that "state explicitly that the Arthur Andersen [TRP] *did not constitute the full and*

---

at *3; *see also Sierra Club v. Dep't of Energy*, 26 F. Supp. 2d 1268, 1271 (D. Co. 1998) ("Extra record evidence may be allowed in cases where an agency is being sued for failure to act if the record before the court is insufficient for the court to determine whether the agency unlawfully withheld compliance with a statutory mandate."). As explained below, such is the case here.

[3] Although the Nation references the arbitrary and capricious standard in passing, its primary focus throughout the Complaint is "the *withholding of agency action that is required*." Compl., ¶ 166 (emphasis added); *see also id.*, ¶ 141 ("Interior has *failed* to provide to the Nation any of the accounting" required by law (emphasis added)); *id.*, ¶ 145–52, 156–64 (listing nine fiduciary obligations that it claims the Government "has not" fulfilled).

11

*complete accounting.*" Compl., ¶ 127 (emphasis added).  Its procedural failures are not limited to the missing source documents for 14% of transactions, although that alone is a basis to reject the report.  *See supra* Note 1.

Of greater concern is that, according to the Government's Index, only 1,772 pages of the 113,655-page administrative record are documents dated before 1972.  *See* AR Index at 134–41, 221, 290.  That means that only 1.56% of the Government's proposed record is made up of documents that pre-date the starting period of the Andersen Report.  *See id.*; *see also* Press Release, Department of the Interior, Office of the Secretary, *Background of the Tribal Trust Funds Reconciliation Project and Proposed Settlement Options*, 1996 WL 719226 (Dec. 1996).  "It is black-letter trust law" that accurate accounting requires a baseline beginning from the "inception" of the trust.  *Cobell VI*, 240 F.3d at 1103 (cleaned up).  It is difficult to imagine how Arthur Andersen could have possibly created a fulsome accounting with only this tiny fraction of historical data.

Additionally, "the reconciliation [in the Andersen Report] did not 'address the completeness of records,' nor calculate 'receipts and disbursements that should have been recorded.'"  *Cobell XX*, 532 F. Supp. 2d at 52. Simply put, "[t]he Andersen Report, limited by defendant as trustee for 'reasons of time and cost' . . . is not complete." *Osage Tribe of Indians of Okla. v. United States*, 96 Fed. Cl. 390, 450 (Fed. Cl. 2010).

Like a zombie, the Andersen Report will not die.  A litany of courts have attempted to euthanize it.  *See supra*.  Yet, it continues to haunt its victims.  To allow this horror story to continue would ignore the Government's "distinctive obligation" to protect a frequently "exploited people." *Seminole Nation*, 316 U.S. at 296.  Once and for all, the Andersen Report must be buried, for it is an incomplete audit that does not provide an adequate accounting of the trust.

         iii.       <u>Non-Record Review Is Warranted for Additional Reasons</u>

"It will often be impossible, especially when highly technical matters are involved, for the court to determine whether the agency took into consideration all relevant factors unless it looks outside the record to determine what matters the agency should have considered but did not." *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980). "The court cannot adequately discharge its duty to engage in a 'substantial inquiry' if it is required to take the agency's word that it considered all relevant matters." *Id.* "In some situations, the record itself will determine whether non-record review is merited . . . [to determine] whether an agency considered all relevant factors." *Nat'l Wilderness Inst.*, 2002 WL 34724414, at *4. This is such a case. "Given . . . the complexity of the decision to be made" in Native American trust cases, *Cobell v. Salazar*, 573 F.3d 808, 813 (D.C. Cir. 2009) (*Cobell XXII*) (allowing extra-record evidence), "[i]t is both unrealistic and unwise to 'straitjacket' the reviewing court with the administrative record." *Asarco*, 616 F.2d at 1160.

    C.    <u>Scope of Discovery</u>

Having concluded that the APA does not limit discovery to the administrative record, the Court must now address the parties' disputes over the scope of discovery beyond the record. The Government contends that the Nation's RFPs are neither relevant nor proportional under Rule 26(b). *See* Def.'s MPO at 17.

        1.    *Relevance*

Relevance "encompass[es] any matter that bears on, or that reasonably could lead to other matter that could bear on any party's claim or defense." *United States ex. rel. Shamesh v. CA, Inc.*, 314 F.R.D. 1, 8 (D.D.C. 2016) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)) (internal quotation marks omitted). When in doubt, "'relevance' for discovery purposes

is broadly construed." *Prasad v. George Washington Univ.*, 325 F.R.D. 1, 3 (D.D.C. 2018) (quoting *Food Lion, Inc. v. United Food & Com. Workers Intern. Union*, 103 F.3d 1007, 1012 (D.C. Cir. 1997)). "This broad interpretation of relevance advances Rule 26's liberal and expansive purpose of permitting the parties to develop the facts, theories, and defenses of the case." *Ted Cruz for Senate v. Fed. Election Comm'n*, 451 F. Supp. 3d 92, 98 (D.D.C. 2020) (cleaned up). Ultimately, "discovery generally should be allowed 'unless it is clear that the information sought can have no possible bearing on the claim or defense of a party.'" *Eng. v. Washington Metro. Area Transit Auth.*, 323 F.R.D. 1, 18 (D.D.C. 2017) (quoting *Zelaya v. UNICCO Serv. Co.*, 682 F. Supp. 2d 28, 32 (D.D.C. 2010)). "[W]here a relevancy objection has been raised, the party seeking discovery must demonstrate that the information sought" is relevant. *Shamesh*, 314 F.R.D. at 8.

The Government first lodges a general objection to all of the RFPs, alleging that the Nation is seeking "discovery into each and every transaction, payment, accounting, audit[], accrual of balances, and receipt[] or disbursement over 200 years." Def.'s MPO at 19. It asserts that these requests "do[] not bear on whether [the Government] comported with [its] obligations to perform the accounting required by law." *Id.* The Government maintains that the 1994 Act "established a *prospective* responsibility for the Secretary of the Interior to account 'for the daily and annual balance of all funds held in trust . . . for the benefit of an Indian tribe.'" Def.'s MPO at 14 (quoting 25 U.S.C. § 4011(a)). Thus, it asserts that it was only ever under a duty to reconcile the Nation's account balances as of September 30, 1995, and provide annual updates thereafter. *See id.* Somehow, it follows this train of logic to conclude that any documents pre-dating the 2013 statute of limitations—and beyond the administrative record—are irrelevant.

But the 1994 Act orders the Government to account for "all funds held in trust . . . for the benefit of an Indian tribe." 25 U.S.C. § 4011(a)). "'All funds' means all funds, irrespective of

when they were deposited" because "one [cannot] determine an accurate account balance without confirming historical account balances." *Cobell VI*, 240 F.3d at 1102. Thus, "the 1994 Act reaffirms the government's preexisting fiduciary duty to perform a *complete historical accounting* of trust fund assets." *Id.* (emphasis added). "This conclusion is reinforced by [the] basic common law trust principle . . . that '[a]n accounting necessarily require[s] a full disclosure and description of each item of property constituting the corpus of the trust at its inception.'" *Id.* at 1103 (quoting *Engelsmann v. Holekamp*, 402 S.W.2d 382, 391 (Mo. 1996)). "Under traditional equitable trust principles, '[t]he trustee's report must contain sufficient information for the beneficiary readily to ascertain whether the trust has been faithfully carried out.'" *Id.* (quoting *White Mountain Apache Tribe of Ariz. v. United States*, 26 Cl. Ct. 446, 449 (1992)). Thus, the sweeping temporal scope of the RFPs is certainly relevant.

The Government also specifically challenges the relevance of RFP Number 4, which seeks "[a]ll documents concerning the United States' appointment of principal chiefs of the Cherokee Nation." Pl.'s RFPs at 6. The Government contends that this request "bears no relevance to [the Nation's] action for an accounting." Def.'s MPO at 27. But the Nation asserts that, from 1906 onwards, the Government would "appoint a 'chief' on behalf of the Nation and illegally treat the appointed 'chief' as the sole repository of the Nation's authority." Pl.'s Opp'n at 13. The chief would then act "at the behest of the [Government]," including taking "actions that impact[ed] the Nation's trust." *Id.* While this RFP is admittedly more tenuously connected to the Nation's request for an accounting than the Nation's other RFPs, the Nation has still shown that these documents, at a minimum, "reasonably could lead to other matter that could bear on any party's claim."

*Shamesh*, 314 F.R.D. at 8 (quoting *Oppenheimer Fund*, 437 U.S. at 351).[4]  Thus, all of the Nation's RFPs clear the first hurdle.

    2.    *Proportionality*

The parties' proportionality dispute centers on the temporal scope of discovery, that is, the Nation's request for *all* trust fund related documents dating back to the inception of the tribal trust. The Nation cites a litany of federal laws that it alleges create and define the trust relationship between the parties, including treaties dating back to 1785, and Acts of Congress as early as 1872. *See* Compl., ¶¶ 18, 49.  As the Nation requests any documents relating to these treaties and statutes, it is admittedly seeking documents that are upwards of 250 years old.  *See* Pl.'s RFPs at 5.

"Once the relevancy of the material sought has been established, the objecting party then bears the burden of 'showing why discovery should not be permitted.'" *Shamesh*, 314 F.R.D. at 8 (quoting *Alexander v. FBI*, 194 F.R.D. 316, 326 (D.D.C. 2000)).  "To determine whether a discovery request is proportional, courts weigh the following six factors: (1) the importance of the issues at stake in this action; (2) the amount in controversy; (3) the parties' relative access to relevant information; (4) the parties' resources; (5) the importance of the discovery in resolving the issues; and (6) whether the burden or expense of the proposed discovery outweighs its likely benefit." *Buie v. Dist. of Columbia*, No. 16-cv-1920, 2019 WL 4345712, at *6 (D.D.C. Sept. 12,

---

[4] The Government also objects to RFP Numbers 15 and 16, see Def.'s MPO at 27, which seek "[a]ll transcripts of testimony" related to the TRP, the Andersen Report and a list of topics including the management and accounting of tribal trust funds, training and supervision of staff, and internal policies and procedures.  See Pl.'s RFPs at 6.  The Government requests the Court to "limit this request[] . . . to that which is not publicly accessible and is within the custody and control of [the Government]."  Def.'s MPO at 28.  The Nation does not object to these limits on RFPs 15 and 16—though it notes that "most deposition transcripts are not a matter of public record," and therefore these RFPs are not a nullity.  Pl.'s Opp'n at 13.  The Court will thus adopt the Government's proposed limitation to these RFPs.

16

2019) (quoting *Oxbow Carbon & Minerals LLC v. Union Pac. R.R. Co.*, 322 F.R.D. 1, 6 (D.D.C. 2017)).

*First*, the Government contends that this litigation does not involve "a discovery issue which could benefit the public at large," as the "issues at stake are confined to the [Nation] and [the Government], and do not have a direct impact beyond the parties involved." Def.'s MPO at 19. But "the Nation is not a single individual party, but rather a sovereign government with hundreds of thousands of members." Pl.'s Opp'n at 12. Moreover, information concerning the Government's compliance with its "moral obligations of the highest responsibility and trust," *Jicarilla*, 564 U.S. at 176 (quoting *Seminole Nation*, 316 U.S. at 296), is an issue of great import to both similarly situated tribes, who are a vital American constituency, and the moral legitimacy of America itself, which impacts the public at large.

*Second*, although the Nation is not seeking money damages, this case concerns the Government's management of billions of dollars held in trust on behalf of the tribes. *See* Press Release, Department of the Interior, Office of the Secretary, *Background of the Tribal Trust Funds Reconciliation Project and Proposed Settlement Options*, 1996 WL 719226 (Dec. 1996) (noting that the Andersen Report, while only surveying 20 years of tribal trust funds, examined trust fund transactions totaling $17.7 billion). It is self-evident that this factor is satisfied given the high dollar amount.

*Third*, as a trustee, the Government will inherently have greater access to trust related documents. *See Cobell v. Norton*, 2002 WL 1480903, at *9 (D.D.C. July 11, 2002) ("The trustee alone is in a position to know all the facts concerning the administration of the trust."). In fact, the Government "took control of the Nation's records" in 1906, few of which were returned when Nation passed a new Constitution in 1970s. *See* Compl., ¶ 99.

As to the fifth factor, the documents in question will be critical to any resolution of this litigation. An accurate accounting of the trust requires historical documents reflecting "all items of property, income, and expenses" tracing back to its inception. *Cobell VI* at 1103 (quoting BLACK'S LAW DICTIONARY (7th ed.1999)).

But factors four and six may necessitate *some* limit on the temporal scope of discovery.[5] Sifting through historical documents can require a "lengthy and expensive search" involving the "collection, imaging, and coding" documents that are housed across "multiple National Archives facilities, Federal Records Centers, and Department of Interior sub-agency offices spread throughout the country." Def.'s MPO at 22. The Government explains in detail the burdens of such a search—concluding that it would require 40% of the Office of Historical Trust Accounting's budget and could take upwards of five and a half years to collect, code, image, review, and, ultimately, produce all of the documents the Nation requests. *See* Def.'s MPO at 24–25.[6]

---

[5] The Government now attempts to narrow the scope of discovery by pointing to the limits courts have imposed at the remedy stage. For example, having already found that the Government had breached its duties as a trustee of tribal funds, the court in *Fletcher* noted that "[a] green eye-shade death march through every line of every account over the last one hundred years isn't inevitable: the trial court may focus the inquiry in ways designed to get the plaintiffs what they need most without imposing gratuitous costs on the government." 730 F.3d at 1214. Even as *Cobell VI* concluded that the Government was obligated to provide a "complete historical accounting," it also recognized that "[d]ocuments necessary for a proper accounting and reconciliation have been lost or destroyed." 240 F.3d at 1097. "Given the history of destruction of documents and loss of information necessary to conduct an historical accounting, the failure of the government to act could place anything approaching an adequate accounting beyond plaintiffs' reach." *Id.* at 1109. While these practical barriers are inevitable, they are to be considered a "limitation[] on this Court's remedial authority, [and] the rationale for respecting th[at] limitation[] is not germane to the question of discovery." *Cobell XIV*, 226 F.R.D. at 93.

[6] This parade of horribles is not quite so frightening given that the *Cobell* litigation alone has lurched along for over 20 years, generating undoubtedly astronomical legal expenses. At some point, one cannot help but wonder if it would be more efficient for the Government to simply agree to the accounting requested by the Nation and its peers rather than continue this unending litigation.

As a solution, the Government posits that discovery should be limited to "six years preceding the filing of the complaint." *Id.* at 25. This date derives from the statute of limitations for actions against the Government. *See id.* But the Court sees no reason to confine discovery to such a narrow window of time, especially as this Court has reserved the statute of limitations issue, giving it no role to play at this early stage of the litigation. *See Cherokee Nation*, 2020 WL 224486, at *3. The Nation contests the picture the Government has painted as to the burden it will face if ordered to produce historical documents. Notably, it "has suggested that there could be ways to share the burden of reviewing and producing documents" from historical archives. Pl.'s Opp'n at 10. Given the great distance between the parties on this matter—and having rejected both parties' requests concerning the temporal scope—the Court will order the parties to confer and develop a revised discovery plan, including a temporal scope for discovery and proposals to minimize the burden that inherently accompanies production of historical documents. If the parties cannot amicably settle the scope of discovery, they are to request a hearing before the undersigned before filing any further discovery motions.

The Government's Motion for a Protective Order is therefore DENIED. A separate Order so stating will issue this day.

_____

ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE