## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**CHEROKEE NATION,**

Plaintiff,

v.

**DEPARTMENT OF INTERIOR**, *et al.*,

Defendants.

Case No. 1:19-cv-02154 (TNM)

## <u>MEMORANDUM OPINION AND ORDER</u>

After more than a year of settlement negotiations, the Cherokee Nation remains at loggerheads with the Department of Interior and several other federal defendants (collectively, the "Government") over the scope of the Government's trust obligations to it. The Nation seeks a full accounting of all its assets held in trust by the United States for the parties' centuries-long history. Meanwhile, the Government insists that it has satisfied its accounting obligation and that any claims alleging otherwise are time barred.

The Nation moved for partial summary judgment on whether the Government's previous reports satisfied its accounting obligations. The Government cross-moved for summary judgment on all counts. A Magistrate Judge issued a Report that recommended granting in part the Nation's motion and denying the Government's motion. The Government objected, and the parties attempted to settle for over a year. After settlement discussions broke down, the Court unstayed the case to rule on the Government's objections.

Having reviewed these objections, the Court will adopt the Magistrate Judge's Report, with some important modifications. In line with the Report, the Court grants the Nation's motion for partial summary judgment, finding that the Secretary of the Interior's previous

accountings do not satisfy her accounting obligations to the Nation.  But the Court diverges from the Report on the scope of the Secretary's accounting obligation.  Rather than finding a broad duty to account limited only by the common law, the Court concludes that the Secretary's duty is grounded in federal statutes and reaches only so far as the statutory text permits.  So the Court grants in part and denies in part the Government's motion for summary judgment.

## I.

### A.

The United States has a trust relationship with Indians and Indian tribes dating to 1790.  *See* Defs.' Resp. ¶ 1, ECF No. 96-3.  As trustee, the United States manages billions of dollars in tribal trust funds, *id*. ¶ 62, which contain deposits from "payments . . . required under treaties or in satisfaction of Indian claims against the United States," as well as income from non-government sources, such as "agricultural, timber, mineral, or oil and gas leases."  *Id*. ¶ 3.

Like many tribes, Plaintiff Cherokee Nation has a longstanding trust relationship with the United States.  *Id*. ¶¶ 2, 9.  But as the Government acknowledges, this relationship has been "fraught."  Defs.' X-MSJ at 5, ECF No. 96.

The Nation's trust relationship with the United States began in the early 1790s when it signed several treaties that, among other things, ceded land in exchange for one-time payments and annual annuities.  Defs.' Resp. ¶ 9; Compl. ¶¶ 19–21, 23–29.  These treaties were often lopsided.  Most infamously, the 1935 Treaty of New Echota, 7 Stat. 478 (Dec. 29, 1835), transferred all Cherokee land east of the Mississippi to the federal government in exchange for $5,000,000 and a "new home" in the West.  Defs.' Resp. ¶ 12.  This "new home" comprised of seven million acres in what is now Oklahoma, plus "free and unmolested use of all the country" to the west of that land.  *Id*. ¶ 15; Treaty of New Echota, 7 Stat. 478.  Shortly after Congress

ratified the treaty, the United States forcibly removed the Cherokee from their ancestral lands in the southeast to the Cherokee Outlet in modern day Oklahoma. Defs.' Resp. ¶¶ 14–15. Thousands of Cherokee Indians died on the march west, now known as the Trail of Tears. *Id*. ¶ 14.

Following their forced relocation, the Cherokee continued to enter treaties with the United States, often ceding land in exchange for payments. As a result of the land transfers, as well as other treaties and agreements, the United States amassed considerable funds that it now holds in trust for the Nation. *Id*. ¶ 54.

**B.**

The Government concededly mismanaged the Nation's trust funds at times. *Id*. ¶¶ 63–64, 70. But starting in the late 19th century, the Government began auditing the Nation's trust accounts, or allowing the Nation to audit the accounts itself. *Id*. ¶ 71.

In 1893, the United States promised the Nation a comprehensive accounting as part of an agreement to buy parts of the Cherokee Outlet. *Id*. ¶ 71(c); *United States v. Cherokee Nation*, 202 U.S. 101, 112–13 (1906). The agreement required the Secretary of the Interior to "render a complete account of moneys due the Cherokee Nation" under several previously ratified treaties and "any laws passed by Congress . . . for the purpose of carrying said treaties" into effect. Agreement of December 19, 1891, S. Executive Doc. No. 52-56, 1st sess. 18 (1892); *see Cherokee Nation*, 202 U.S. at 113. Congress ratified the agreement in the Act of March 3, 1893, and appropriated $5,000 to employ an expert to "properly render a complete account for the Cherokee Nation of moneys due." Pub. L. No. 52-209, 27 Stat. 612, 643; *Cherokee Nation*, 202 U.S. at 113. If the accounting proved to be "incorrect or unjust," the agreement provided the

Nation the right to contest the accounting in the Court of Federal Claims within 12 months of receiving it.  Act of March 3, 1893, 27 Stat. 612; *Cherokee Nation*, 202 U.S. at 113.

The Bureau of Indian Affairs (BIA) produced a report of its accounting in 1894.  Pl.'s Resp. ¶¶ 3–5, ECF No. 100-1.  The report identified four errors in the Secretary's management of the Nation's trust, and concluded that, because of those errors, the United States owed the Nation a total of $1,133,841.98 under four treaties.  *See id.* ¶ 6.  The Secretary delivered the report to the Nation, and the report was accepted by the Nation's council in December 1894.  *Cherokee Nation*, 202 U.S. at 113.  The Nation never sued the United States for this accounting—within the 12-month limitations period or after.  *See Cherokee Nation v. United States*, 40 Ct. Cl. 252, 319 (1905) (explaining that the Nation "signified their acceptance [of the 1893 accounting] thereby waiving the items which the accountants had disallowed and its right to carry those rejected items into the courts of the United States"), *aff'd*, 202 U.S. 101 (1906).  The Nation, however, did sue the United States for subtracting from its trust account the costs of the Cherokees' 1835 removal from their ancestral lands.  *Id*. at 322.

## C.

In the late 19th century, Congress changed tactics with the tribes.  *See* Defs.' Resp. ¶ 21.  Rather than relate individually to tribes as separate sovereigns, the Interior Department and then Congress embarked on a program of "allotment" under which the United States transferred collectively held tribal lands to individual Indians.  *Id*.  Allotment aimed to assimilate Indians into broader society by giving them tracts of reservation land.  *Id*.  In line with this policy, Congress established the Commission to the Five Civilized Tribes, *id*. ¶¶ 20, 23, which by 1914 had allotted or auctioned most of the remaining unreserved Cherokee lands.  *See* Pl.'s Resp. ¶¶ 14–15, 17, 24.

In March 1924, Congress enacted a law conferring jurisdiction on the Court of Claims to adjudicate "any and all legal and equitable claims arising under or growing out of any treaty or agreement between the United States and the Cherokee Indian Nation" that had not been "adjudged on their merits by the Court of Claims or the Supreme Court of the United States." Act of March 19, 1924 (1924 Act), Pub. L. No. 68-68, 43 Stat. 27; *see also Cherokee Nation v. United States*, 102 Ct. Cl. 720, 723–24 (1945).  The Act further provided that any claims within its purview would be barred unless suit was instituted within five years from the date of the Act's approval.  1924 Act, 43 Stat. 27, 27–28.

As part of the 1924 Act, the United States allowed the Nation's attorneys to examine its books in preparation for litigation.  *See* Pl.'s Resp. ¶ 73.  The Nation employed an accounting firm to examine and report on "all financial transactions with the . . . Tribe, as shown by the books of account of the United States." *Id*. ¶ 72.  Based on this accounting work, the Nation filed several lawsuits between 1926 and 1930.  *Id*. ¶ 78.  In response to one suit, the United States enlisted the General Accounting Office to prepare its own accounting of the Nation's trust funds.  *See Cherokee Nation*, 102 Ct. Cl. at 760.  The Court of Claims evaluated this accounting and the Nation's response to it but declined to remand for any further accounting, "in view of the time that ha[d] elapsed since th[e] [Nation's] petitions were filed." *Id*. at 759–60.  The Court of Claims ultimately concluded that the United States owed the Nation around $25,000. *Id*. at 769; Pl.'s Resp. ¶ 98.

In 1946, Congress established the Indian Claims Commission to hear claims brought by Indian tribes against the United States.  Act of August 13, 1946, Pub. L. No. 79-726, 60 Stat. 1049.  Between 1948 and 1977, the Nation brought at least 11 claims in four lawsuits before the Commission.  Pl.'s Resp. ¶ 106.  Two of these lawsuits related to the Cherokee Outlet's sale

price and the assignment of Outlet lands to other tribes. *Id*. ¶ 107. These suits returned money judgments totaling over $18 million. *Id*.

**D.**

These early measures to account for Indian trust funds did not satisfy the tribes. Nor did they satisfy Congress. Between 1989 and 1992, the House Committee on Government Operations held several hearings to investigate the way BIA handled Indian trust funds. Defs.' Resp. ¶ 74. These hearings raised red flags about BIA's accounting practices and overall management of Indian trust finances. *Id*. ¶¶ 74–84. The Committee concluded that BIA's management had been "grossly inadequate," that the agency "failed to accurately account for Trust Fund monies," and that it could not "even provide account holders with meaningful periodic statements on their account balances." *Id*. ¶ 82.

In the wake of these investigations, Congress passed the American Indian Trust Fund Management Reform Act of 1994 (1994 Act), Pub. L. No. 103-412, 108 Stat. 4239 (codified at 25 U.S.C. §§ 4001 *et seq.*). The 1994 Act imposed several new requirements on the Secretary regarding the management of Indian Trust Assets. Broadly, the Act required the Secretary to provide "adequate systems of accounting," "adequate controls over receipts and disbursements," "timely reconciliations," and "consistent, written policies and procedures for trust management and accounting." 25 U.S.C. § 162a(d).

In a separate section, the 1994 Act requires the Secretary to account to "account for the daily and annual balance of all funds held in trust by the United States for the benefit of an Indian tribe or an individual Indian which are deposited or invested pursuant to the Act of June 24, 1938." 108 Stat. 4239 (codified at 25 U.S.C. § 4011(a)). That section further requires the

Secretary to provide periodic statements of account performance to each account holder and conduct an annual audit of trust accounts each fiscal year. *Id.*

In a separate section, the 1994 Act required the Secretary to give Congress "a report identifying for each tribal trust fund account for which the Secretary is responsible a balance reconciled as of September 30, 1995." 25 U.S.C. § 4044. Before submitting this report, the Secretary had to obtain attestations from each tribal account holder that he had provided "as full and complete accounting as possible of the account holder's funds to the earliest possible date, and that the account holder accepts the balance as reconciled." *Id.* § 4044(2).[1] If the account holder disputed the balance of its reconciled account, the Secretary was required to provide a statement for each disputed balance and outline the efforts he would "undertake to resolve the dispute." *Id.* § 4044(3).

Around the same time, the Secretary engaged the accounting firm Arthur Anderson LLP to "reconstruct historical transactions . . . for all years for which records are available for all Tribal Trust accounts." Pl.'s Resp. ¶ 115. But Arthur Anderson was not up to this Herculean task. Early on, it conceded that "not all records would be available for a full accounting" for all tribal funds, *id.* ¶ 118, and that "a complete reconciliation of all trust activity was impractical, cost prohibitive, and in all likelihood, impossible," *id.* ¶ 119. This was in part "[d]ue to missing records, the lack of an audit trail in BIA's systems, and cost and time constraints." Defs.' Resp. ¶ 108. Hands tied, Arthur Andersen limited its report to the 20-year span from July 1972 through September 1992. Pl.'s Resp. ¶¶ 109, 123.

---

[1] The Secretary at that time was Bruce Babbitt, so the Court uses male pronouns. The Court uses female pronouns to refer to the current Secretary, Deb Haaland.

For the Nation specifically, the Anderson Report reconciled only 86% of noninvestment transactions.  Defs.' Resp. ¶ 116.  And it matched only 12% of disbursements to backup documentation.  *Id*.  The Report also flagged discrepancies between the investment yields on the Nation's accounts and the benchmark rate, for which it proposed corrections.  *Id*. ¶ 119–121. The Report did not review the Nation's surface or mineral leases even though Interior's Special Trustee had called the failure to account for lease revenues as "major concern."  *Id*. ¶¶ 133–35.

As ordered, the Secretary delivered the Reconciliation Report to Congress in May 1996. Pl.'s Resp. ¶ 108.  The Report included an attestation from the Nation that it had received the Anderson Report but that it needed more time to review it.  *Id*. ¶ 113.  The Nation did not file any suit challenging the Anderson Report's findings or the Government's accounting obligations under the 1994 Act—until now.

### E.

The Nation filed its three-count Complaint against the Department and various government officials in 2019.  *See generally* Compl.  Count I seeks an accounting of funds held in trust by the United States that accrued as a result of various treaties, other agreements, and congressional or administrative acts dating to 1785.  *Id*. ¶ 132.  As the basis for this Count, the Nation invokes the common law "right to an accounting of the Trust Fund as a beneficiary."  *Id*. ¶ 3.  Count II is based on the Secretary's duty to account under §§ 4011 and 4044 of the 1994 Act.  *Id*. ¶ 141.  As a remedy, the Nation demands "as full and complete an accounting as possible of the Nation's funds, assets and natural resources to the earliest possible date."  *Id*. ¶ 154.  This includes "all lands owned by the Nation which the Government sold at least in part to pay money or other items to the Nation" as well as leases, mineral, hunting, and navigational rights, and all income derived from them.  *Id*. ¶ 135 n.6.  Last, Count III seeks an accounting

under the Administrative Procedure Act.  The Court has construed Count III as "a failure-to-act claim under § 706(1)."  *Cherokee Nation v. Dep't of Interior*, No. 1:19-cv-02154 (TNM), 2021 WL 3931870, at *1 (D.D.C. Sept. 2, 2021).

Following discovery, the Nation moved for partial summary judgment, asking the Court to rule that the Government's previous accounting efforts—including the Anderson Report—did not discharge its accounting obligations.  *See* Pl.'s MSJ, ECF No. 88.  The Government then cross-moved for summary judgment on all counts.  *See* Defs.' X-MSJ.

In February 2023, Magistrate Judge Zia M. Faruqui issued a Report that recommended granting partial summary judgment on the Nation's claim that the Arthur Anderson Report did not satisfy the 1994 Act's accounting requirement and denying the Government's cross-motion for summary judgment.  *See* Report and Recommendation (R&R) at 33–34, ECF No. 109.[2]  The Government objected.  *See* Defs.' Objs., ECF No. 111.  The Court then stayed the case—at the parties' request—to facilitate settlement negotiations.  Those negotiations ultimately failed.  So the Court unstayed the case to rule on the Government's objections.

## II.

Under Rule 56, a party may move for summary judgment in whole or in part but must "identify[] each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  The Court must grant summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.*  "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence

---

[2]  The Magistrate Judge further recommended denying the Nation's request for Rule 37 sanctions.  *See* R&R at 33–34.  The Court adopts this recommendation, to which the Nation did not object.

is such that a reasonable jury could return a verdict for the nonmoving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The moving party bears the burden of showing that there is no genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). But once it carries its burden, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250. In ruling on summary judgment, the Court views the evidence "in the light most favorable to the nonmoving party and . . . must draw all reasonable inferences in favor of the nonmoving party." *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

When a party seeks summary judgment on an APA claim, a slightly modified standard applies. This is because of the "the limited role of a court in reviewing the administrative record." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89 (D.D.C. 2006). Under the APA, the agency "resolve[s] factual issues to arrive at a decision that is supported by the administrative record." *Id.* at 90. The role of the district court is to determine whether, as a matter of law, the "the evidence in the administrative record permitted the agency to make the decision it did." *Id.* (cleaned up). "Summary judgment thus serves as the mechanism for deciding . . . whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Id.*

Last, the Court applies a "a *de novo* standard of review when considering objections to, or adoption of, a magistrate judge's Report and Recommendation." *Means v. District of Columbia*, 999 F. Supp. 2d 128, 132 (D.D.C. 2013). In ruling on objections, the Court may "accept, reject, or modify, in whole or in part" the magistrate judge's recommendations. 28

U.S.C. § 636(b)(1)(C).  "Th[e] Court alone is responsible for rendering the ultimate decision as to the merits of th[e] case."  *Est. of Heiser v. Islamic Repub. of Iran*, 466 F. Supp. 2d 229, 258 (D.D.C. 2006); *see also Roell v. Withrow*, 538 U.S. 580, 585 (2003) (noting that a district court is "free to do as it sees fit with [a] magistrate judge's recommendations" made under authority of 28 U.S.C. § 636(b)(1)).

## III.

The Nation seeks an order establishing that the Government's previous accounting efforts—including the Arthur Anderson report—"do not contain an accounting that satisfies the United States' trust obligation to the Nation."  Pl.'s MSJ at 1.  The Government, for its part, moves for summary judgment on all counts.  Defs.' X-MSJ at 1.  In ruling on these motions, the Court will first delineate the scope of the Government's duty to account and then determine whether its accounting efforts have fulfilled that duty.

## A.

The Nation says that the Government's duty to account arises from several sources.  At the highest level, it posits that the Government has an inherent duty to account as trustee for the Nation.  *See* Compl. ¶¶ 131–37; Pl.'s Reply at 13–14, ECF No. 99.  But the Supreme Court has rejected this view.  Even so, the Nation argues that the Government still has a sweeping obligation to account under the 1994 Act and the APA.  *See* Compl. ¶¶ 138–66.  The Government does not dispute that the 1994 Act imposes an accounting duty, though it insists it is not so broad as the Nation says.

The Magistrate Judge's Report set aside whether the Government has a stand-alone common law accounting duty because it determined that the Government's statutory accounting duty incorporates the full scope of the common law remedy.  *See* R&R at 17–18, 22.  The Court

agrees that the Government has a statutory obligation to account.  But in line with the Government, it concludes that this obligation is narrower than what the common law generally requires.

1.

Start with whether the Government has a common law duty to account.  The Nation argues that the duty to account is a "fundamental principle governing the subject of trust administration."  *White Mountain Apache Tribe of Arizona v. United States*, 26 Cl. Ct. 446, 448 (1992).  So the Government cannot escape this common law duty to account any more than a private trustee can:  The duty "inheres in the trust relationship itself."  *Cobell v. Norton* (*Cobell VI*), 240 F.3d 1081, 1103 (D.C. Cir. 2001).  The Government, meanwhile, does not contest that it is trustee for the Nation.  Nor does it deny that the parties have a longstanding trust relationship.  Defs.' Resp. ¶ 2.  But it argues that this relationship does not carry an "inherent" common law obligation to account.  *Id*.

The Court agrees.  As trustee for the Nation, the United States is not subject to every common law fiduciary duty.  Although the Government's relationship with the tribes is loosely analogous to that of a private trustee, its fiduciary obligations are governed by "applicable statutes and regulations."  *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 177 (2011).  And these are not necessarily coextensive with fiduciary obligations under the common law.  *See id*.  In root and branch, the Government's trust obligations are "established and governed by statute," not the common law.  *Id*. at 165.  "[A]nd in fulfilling its statutory duties, the Government acts not as a private trustee but pursuant to its sovereign interest in the execution of federal law."  *Id*.  Accordingly, "an actionable fiduciary relationship" cannot arise "by operation

of federal common law" alone.  *El Paso Nat. Gas Co. v. United States*, 750 F.3d 863, 896 (D.C. Cir. 2014).

Just as the trust relationship must have a statutory source, so must the Government's specific fiduciary duties as trustee.  The trust relationship alone does not unlock the full suite of equitable remedies for common law breach of fiduciary duties.  *See Jicarilla*, 564 U.S. at 174 ("Congress may style its relations with the Indians a 'trust' without assuming all the fiduciary duties of a private trustee . . . .").  Rather, "[t]he Government assumes Indian trust responsibilities only to the extent it expressly accepts those responsibilities by statute."  *Id*. at 177.  This includes any "specific obligations the Government may have under [the trust] relationship," *Menominee Indian Tribe of Wisconsin v. United Stat*es, 577 U.S. 250, 258 (2016) (cleaned up), including the duty to account, *Cobell v. Salazar* (*Cobell XXII*), 573 F.3d 808, 813 (D.C. Cir. 2009).

So before a tribe can seek to compel an accounting, it "must first 'identify *a substantive source of law* that establishes' that specific fiduciary duty."  *El Paso Nat. Gas Co.*, 750 F.3d at 895 (quoting *United States v. Navajo Nation*, 537 U.S. 488, 490 (2003)); *see also Cobell XXII*, 573 F.3d at 813 (affirming that "the extent that the scope of [an] accounting is derived from statutory law.").  The scope of the Government's fiduciary duties is then a "matter of statutory interpretation."  *See El Paso Nat. Gas Co.*, 750 F.3d at 895.

This is not to say that common law principles are irrelevant.  As with any statutory interpretation question, the Court "assume[s] Congress has legislated against the background of traditional 'adjudicatory principles'—including traditional adjudicatory principles found in trust law."  *Fletcher v. United States*, 730 F.3d 1206, 1208 (10th Cir. 2013) (Gorsuch, J.).  Indeed, common law trust principles "may help illuminate the meaning of a 'specific, applicable, trust-

creating statute or regulation.'"  *Id.* (quoting *Jicarilla*, 564 U.S. at 184).  But background principles cannot "override" the statutory language that defines the Government's fiduciary obligations to tribes.  *Id.*

In Count I, the Nation invokes its common law "right to an accounting of the Trust Fund as a beneficiary."  Compl. ¶ 3.  But the Nation is no ordinary beneficiary and the United States no ordinary trustee.  The Nation cannot source the Government's obligation to account in the common law of trusts alone.  Though some courts have suggested that tribal trust relationships create an inherent duty to account, *Cobell VI*, 240 F.3d at 1103, and that Congress has merely "codifie[d]" that duty in statutes like the 1994 Act, *Assiniboine and Sioux Tribe of the Fort Peck Indian Rsrv. v. Norton*, 211 F. Supp. 2d 157, 158 (D.D.C. 2002), these cases clash with recent Supreme Court precedent.  It is now clear that "neither the general trust relationship between the federal government and Indian Tribes nor the mere invocation of trust language in a statute" is enough to create a cause of action for breach of trust, *El Paso Natural Gas Co.*, 750 F.3d at 893, such as a failure to provide an accounting.

The Nation cries foul, saying the Government twists the Supreme Court's holding in *Jicarilla* to argue that the "common law is irrelevant to issues related to Indian trust fund management."  Pl.'s Opp'n at 12, ECF No. 100.  But the Government does not argue nor does the Court conclude that the common law is irrelevant.  To the contrary, the common law is highly relevant when it illuminates an established statutory duty.  It is only when the Nation relies on common law rights unmoored from statutory support that it goes adrift.  *See Jicarilla*, 564 U.S. at 177 ("When the Tribe cannot identify a specific, applicable, trust-creating statute or regulation that the Government violated, neither the Government's control over Indian assets nor common-law trust principles matter." (cleaned up)).  Nor does it matter, as the Nation asserts,

that *Jicarilla* addressed other fiduciary duties and not the duty to account.  The principle that courts may only "apply common-law trust principles where Congress has indicated it is appropriate to do so," *id*. at 178, is still binding.  Since the Nation does not identify a specific statute creating a cause of action for an accounting in Count I, the Court will grant summary judgment to the Government on that count.

**2.**

Now that it is clear the Government's accounting obligation must arise from a specific statute or regulation, the Nation turns to the 1994 Act, which contains two provisions requiring the Government to account for funds held on behalf of tribes.  Section 4044 of the 1994 Act imposed a one-time requirement for the Secretary to transmit to Congress "a report identifying for each tribal trust fund account for which the Secretary is responsible a balance reconciled as of September 30, 1995."  25 U.S.C. § 4044.  Before completing the report, the Secretary had to solicit attestations from tribal beneficiaries that he had provided "a full and complete accounting" or that "the account holder disputes the balance" of the account.  *Id*. § 4044(1), (2)(A)–(B).  Section 4011, meanwhile, requires the Secretary to "account for the daily and annual balance of all funds held in trust by the United States for the benefit of an Indian tribe or an individual Indian which are deposited or invested pursuant to section 162a of this title."  *Id*. § 4011(a).

The parties agree that the 1994 Act imposes some duty on the Government to account to tribal beneficiaries.  *See* Defs.' X-MSJ at 54–55.  They diverge only on the scope of that duty.

The Government admits that it has an accounting duty under § 4044.  *Id*.  But it argues that it discharged its obligations when it transmitted the Anderson Report to the Nation in 1996, and that any challenge to the adequacy of the Anderson Report is time barred.  *Id*.  As to § 4011,

the Government insists that any obligation it has under that provision is subsumed by § 4044 or, at most, applies only prospectively to a limited set of funds. *Id*. at 56–58.

The Nation, on the other hand, argues that §§ 4044 and 4011 impose distinct accounting duties, so that the Government's satisfaction of one duty does not mean that it has satisfied the other. *See* Pl.'s Opp'n to Objs. at 13–18, ECF No. 112; R&R at 19–20 (concluding that §§ 4011 and 4044 impose "distinct" requirements). It also contends that the Government's accounting duty under § 4011 applies retrospectively and encompasses all assets held in trust—not just a limited set of "funds." Pl.'s Opp'n to Objs. at 15–16. The truth lies between them.

In determining the Government's duty, the Court "must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions." *Navajo Nation*, 537 U.S. at 506. At bottom, the scope of the Government's duties is a question of statutory interpretation. *See El Paso Nat. Gas Co.*, 750 F.3d at 895.

**a.**

Start with the Government's duty under § 4044. As always, "[i]n addressing a question of statutory interpretation, [the Court] begin[s] with the text." *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 330 (D.C. Cir. 2020) (cleaned up).

Section 4044 requires the Secretary to "transmit to [Congress] . . . a report identifying for each tribal trust fund account . . . a balance reconciled" as of 1995. 25 U.S.C. § 4044. But embedded in this primary requirement is an important prerequisite. Before submitting the report, the Secretary had to obtain "attestations by each account holder that . . . [he] has provided the account holder with as full and complete accounting as possible of the account holder's funds to the earliest possible date." *Id*.

By its terms, § 4044 calls for a one-off reconciliation report to Congress.  Still, the Government does not deny that § 4044 imposed a distinct and actionable duty on the Secretary to account to the tribes.  Defs.' X-MSJ at 54–55.  Nor does the Government suggest that its duty to account under § 4044 was any narrower than what is required under the common law.  And in any case, because the concept of an "account" or "accounting" has "a long known and particular meaning in background trust law," *Fletcher*, 730 F.3d at 1210, the Court "assumes" that Congress legislated with that "background" in mind, *id*. at 1208.

Adopting the common law background, § 4044 required the Secretary "to render . . . an account of the administration of the trust" to the beneficiary.  Restatement (Second) of Trusts § 172 (1959).  An "account" typically consists of a "statement . . . with debts and credits arising from the relationship of [the] parties."  *Accounting*, Black's Law Dictionary (6th ed. 1990).  And an action for an accounting generally "requires a full disclosure and description of each item of property constituting the corpus of the trust at its inception."  *Cobell VI*, 240 F.3d at 1103 (cleaned up).  Once the trust property is determined, the trustee must "reconcil[e] the accounts, taking into account past deposits, withdrawals, and accruals."  *Id*. at 1102 (cleaned up).

Nothing in § 4044 suggests that Congress intended to limit the scope of the accounting to less than what the common law requires.  To the contrary, textual clues indicate the breadth of the Government's accounting duty here.

*First*, § 4044 requires the Secretary to provide "as full and complete accounting as possible."  25 U.S.C. § 4044(2)(A).  A "full and complete accounting" is "free from deficiency," *Full*, Webster's New International (2d. 1941), and has "no part or element lacking," *Complete*, *id*.  Similarly, it is an accounting that has been "brought to an end or to a final or intended condition."  *Id*.  In other words, § 4044 does not permit shortcuts, like a partial accounting or

17

sample-based accounting, at least when a more comprehensive accounting would be "possible." *Cf. Cobell XXII*, 573 F.3d at 813–14 (accounting under § 4011 could use "statistical sampling" when "a complete historical accounting" would be impracticable). Section 4044 also requires the Secretary to account "to the earliest possible date." This demonstrates that Congress intended the Secretary to account for all historical trust assets, no matter if they had been included in earlier accounting efforts. Again, § 4044's language is maximal and unambiguous. The only limitation on how far back the accounting must go is whether it is "possible." 25 U.S.C. § 4044(2)(a).

*Second*, § 4044's accounting requirement includes the gamut of an account holder's "funds." *Id*. Though "funds" might imply only monetary assets, under the common law, a trust's "funds" includes all "[m]oney or property set aside as a trust . . . and held by a trustee," *Trust Fund*, Black's Law Dictionary (6th ed. 1990), possibly including assets like mineral leases and navigation rights. This inclusive definition of "funds" aligns with § 4044's broad language requiring a "full and complete accounting" and not just an accounting of the transactions recorded on a fund's ledger. *Cf. Fletcher*, 730 F.3d. at 1210 ("[Courts] *may* refer to traditional trust principles when those principles are consistent with the statute and help illuminate its meaning.)."

There is, however, one significant limitation to § 4044's reconciliation report: It was a one-off. At common law, a trustee's duty to account is ongoing. *See* G. Bogert & G. Bogert, The Law of Trusts and Trustees § 968 (3d. ed. 2007). A beneficiary in theory can demand a full and complete accounting whenever he sees fit. *Id*. § 966 (explaining that a private "trustee can be compelled by the court at any time to present an account in court"). Section 4044, in contrast, requires account holders to provide "attestations" that "the Secretary *has provided* . . . a full and

complete accounting."  25 U.S.C. § 4044 (emphasis added).  And Congress's use of the present perfect "has provided" suggests that the accounting requirement is one-and-done.  *See Barrett v. United States*, 423 U.S. 212, 216 (1976) (observing that Congress used the present perfect tense to "denot[e] an act that has been completed").

Statutory context confirms this limitation.  The accounting requirement here is just one part of § 4044's primary task—providing a one-time, comprehensive report to Congress on the state of tribal trust fund accounts.  And that task had a specific due date.  *See* 25 U.S.C. § 4044 ("by May 31, 1996").  In this sense, § 4044 tracks previous congressional efforts to clean the slate for tribal trust accounts.  *See, e.g.*, Act of March 3, 1893, 27 Stat. 612 (creating one-time obligation for Secretary to employ experts to "properly render a complete account to the Cherokee Nation of moneys due said nation").  So if the tribes have a cause of action to demand an accounting under § 4044, it is limited to the accounting performed in anticipation of the 1996 reconciliation report to Congress.

### b.

Alongside § 4044, the Secretary also has an ongoing duty to provide a historical accounting for assets held in trust under § 4011.  This provision—which was also part of the 1994 Act—requires the Secretary to "account for the daily and annual balance of all funds held in trust by the United States for the benefit of an Indian tribe or an individual Indian which are deposited or invested pursuant to [25 U.S.C. § 162a]."  25 U.S.C. § 4011(a).  The Nation argues that this provision (coupled with the inherent common law duty) creates a broad, retrospective duty to account, which includes all trust assets.  Pl.'s Reply at 12.  The Government responds that § 4011 creates only a limited prospective duty to account.  Defs.' X-MSJ at 55.  And so far

as § 4011 imposes any retrospective duty to account, the Government claims that it is coextensive with § 4044 and subject to the same statute of limitations. *Id.*

The Magistrate Judge's Report rejected the Government's prospective reading of § 4011. The Court largely agrees with the Report. Both text and precedent show that § 4011 imposes a retrospective duty to account. But unlike § 4044, § 4011 makes no pretense of hitting the reset button. Section 4044 required "as full and complete accounting as possible . . . to the earliest possible date." Meanwhile, the accounting remedy in § 4011 is limited in content and temporal reach. So though the Secretary has some duty to account under § 4011, the Nation cannot expect the same exhaustive treatment owed under § 4044.

Start with the basic question of whether § 4011 imposes a duty to account. On this, the Court need look no further than the plain text to conclude that § 4011 "impose[s] on the federal government a duty to 'account for' . . . the daily and annual balances of money it holds in trust." *Fletcher*, 730 F.3d at 1209. As with § 4044, the phrase "account for" takes its common law meaning. *Id.* at 1210. At common law, "[t]he fundamental objectives of a trust accounting are to communicate useful information about the trust estate and its management to those who receive it." Bogert, *supra*, § 968. So to "account" to the tribes, the Secretary must provide "at a minimum, complete and accurate information with regard to the assets in the trust at the beginning of the accounting period, transactions during the period, and the assets in the trust at the end of the period." *Id.* And as with § 4044, the duty to account implies a cause of action to account in court. *Fletcher*, 730 F.3d at 1211. If anything, that implication is stronger here, for § 4011 expressly states that the Secretary "shall" account to tribes and does not embed that requirement in a separate duty to report to Congress. *See Bridgeport Hosp. v. Becerra*, 108 F.4th 882, 887 (D.C. Cir. 2024) ("[T]he word 'shall' generally signals a mandatory duty."); Antonin

Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts, 112–13 (2012) (same).

Caselaw reinforces this conclusion. In *Cobell XXII*, the D.C. Circuit held that § 4011 requires the Secretary to provide retrospective accountings for individual Indian trust fund holders. 573 F.3d at 813. And the Tenth Circuit in *Fletcher* similarly held that § 4011 "invest[s] individual tribe members with an enforceable right to an accounting." 730 F.3d at 1210; *see also Cherokee Nation*, 2021 WL 3931870, at *2 (relying on *Cobell XXII* and *Fletcher* to conclude that "trust beneficiaries, including tribes, are entitled to an accounting under [§ 4011]").

The Government correctly notes that neither circuit reached the question of whether § 4011 created accounting rights for the *tribes*—they merely assumed it to be the case. Perhaps this is because it is plain from the text. Or perhaps it was because this was the Government's own stated position. *See Fletcher*, 730 F.3d at 1213 ("The government doesn't dispute that § 4011(a), properly read, does require it to provide an accounting [to Indian tribes]"). In any event, considering the parallelism in § 4011—which requires an account for "all funds held in trust . . . for the benefit of an Indian tribe *or* an individual Indian"—a reading that creates lopsided obligations would strain plain meaning. *Id.* (emphasis added).

But that is precisely the Government's argument. Although it acknowledges that § 4011 creates a retrospective duty to account to *individual Indians*—incidentally, the reverse of its position in *Fletcher*—it argues that any retrospective duty owed to the tribes under § 4011 is trumped by, subsumed under, or must be harmonized with § 4044. *See* Defs.' X-MSJ at 56–57. This argument has some logical appeal. Section 4044 already supplies a duty to retroactively account for the tribes' funds. So any requirement under § 4011 to perform a retrospective accounting that reaches back before 1994 would be duplicative. But logic alone cannot provide

the basis for an interpretation that has no grounding in the text.  And squint as one may, nothing in § 4011 suggests a hard and fast 1994 cutoff.

Still, the Government tries to cobble together a textual basis for its prospective reading. It asserts that § 4011 must only apply prospectively to the tribes because it uses the present tense: "[t]he Secretary shall account for . . . all funds . . . which *are deposited* or invested pursuant to section 162a of this title."  *Id*. (emphasis added); *see* Defs.' Objs. at 23–24.  The present tense "are deposited," says the Government, "is an 'indicator of [the provision's] prospective orientation.'"  Defs.' Objs. at 24 (quoting *Carr v. United States*, 560 U.S. 438, 449 (2010)); *see also Sherley v. Sebelius*, 644 F.3d 388, 394 (D.C. Cir. 2011) ("The use of the present tense in a statute strongly suggests it does not extend to past actions.").  On this logic, funds that *are* deposited in tribal trust accounts after 1994 are different and exclusive of previously deposited funds.

Not so.  There is an alternative—and more compelling—reading of the phrase "funds held in trust . . . which are deposited."  25 U.S.C. § 4044.  To be grammatically exact, "are deposited" is in the present tense but the passive voice.  While the phrase itself focuses on the present condition—indicating that the funds currently *are* deposited—the passive voice implies that the action of depositing has already been completed.  To see this, compare the phrase "are deposited" (present tense, passive voice) with "are being deposited" (present continuous tense, passive voice), which suggests that the action of depositing is ongoing.  Or compare "will be deposited" (future tense, passive voice), which shows that act of depositing will happen.  After all, to say that "the die is cast" or "Caesar is slain" speaks of a *present* state of being that arose from *past* events.

The same logic applies here.  Section 4011 requires an accounting of future funds that "are deposited" in private banks under § 162(a).  While funds that "are deposited" could include funds that will be transferred, it also denotes funds which are currently "deposited" or "place[d]" in the bank.  *Deposit*, Oxford English Dictionary (2d. ed. 1989) (defining "deposit" as "to place in some repository . . . for safe keeping").  This reading makes sense in context, considering an accounting generally "confirm[s] historical account balances." *Cobell VI*, 240 F.3d at 1102.  And courts will not read the use of the present tense as precluding application to past actions when context "indicates otherwise." *Sherley*, 644 F.3d at 394 (quoting 1 U.S.C. § 1).

Binding precedent bolsters this view.  In *Cobell XXII*, the Circuit held that § 4011 requires the Government to provide tribal members a retrospective accounting when asked.  573 F.3d at 813; *see also Fletcher*, 730 F.3d at 1210 (same).  And the Circuit based this retrospective requirement on the same language—"are deposited"—that the Government claims creates only a prospective requirement for the tribes.  Courts generally presume that "the same word appearing in different portions of a single provision" has the same meaning. *Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1437 (D.C. Cir. 1996).  So to conclude that § 4011's single use of "are deposited" has one meaning as applied to the tribes and another as applied to individual Indians would defy interpretive norms.  It would also be surpassing strange.

The Government posits that a prospective reading is the only way to "[r]econcil[e]" §§ 4011 and 4044.  Defs. X-MSJ at 56.  In its view, reading § 4011 as creating an independent retrospective duty to account to tribes would duplicate the obligation of § 4044. *See* Objs. at 24–25.  And when "[w]hen statutes intersect, the specific statute[] . . . trump[s] the general." *Loving v. IRS*, 917 F. Supp. 2d 67, 77 (D.D.C. 2013), *aff'd*, 742 F.3d 1013 (D.C. Cir. 2014).

As the Magistrate Judge's Report concluded, this reading is "unsupported by the plain text." R&R at 21. To be sure, §§ 4011 and 4044 impose seemingly overlapping accounting duties. But there is no suggestion that these obligations clash, such that one must "trump" the other. It is true that when "a general authorization and a more limited, specific authorization exist side-by-side," courts typically enforce the specific authorization, to avoid "the superfluity of a specific provision that is swallowed by the general one." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). But if anything, §§ 4011 and 4044 present the reverse. Section 4011 imposes a general ongoing duty to account, though one with a limited scope. And § 4044 imposes a specific, one-time requirement for the Secretary to conduct "full and complete" accounts to help provide a comprehensive reconciliation report to Congress. The Government asks the Court to assume that § 4044's specific requirement obviates § 4011's general one. But the Court knows of no interpretive canon that would have it ignore a general requirement simply because another specific requirement accords with it.

There is no denying that some of the reconciliation report's work overlaps with an accounting under § 4011. But that does not mean that § 4044 renders § 4011's *ongoing* duty superfluous. Congress could intend for the tribes to have an ongoing right to demand a narrow accounting for monetary funds—despite the Secretary having already provided a "full and complete" accounting. But even assuming § 4011's retroactive accounting requirement is duplicative, the Court will not rely on statutory context and the presumption against superfluity to introduce ambiguity into an otherwise unambiguous text. *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 227 (2008) (explaining that textual canons cannot be used to "create ambiguity where the statutes text and structure suggest none").

24

Last, the Government argues that, at the very least, the Court should read §§ 4044 and 4011 "harmoniously" as creating "one retrospective accounting duty as to tribes subject to the more-specific limitations included in Section 4044." Defs.' X-MSJ at 56–57. On this reading, § 4044's language requiring a "full and complete accounting" merely implemented § 4011's duty to account. So long as the Government satisfies § 4044, it necessarily satisfies § 4011, at least for trust activity prior to 1994.

Again, nothing in § 4044's text—or, for that matter, the surrounding context—suggests that Congress intended to nullify § 4011(a)'s ongoing accounting duty when it imposed a separate duty requiring the Secretary to file a reconciliation report. The two provisions no doubt would lead to overlapping work product. And nothing prohibits the Secretary from using the accounting reports under § 4044 to satisfy her duties under § 4011. But just because the Secretary *could* satisfy two duties with one accounting does not mean that she *necessarily* does so.

All in all, this circuit and at least one other have concluded that § 4011 creates a retrospective accounting duty to individual Indians. *See Cobell XXII*, 573 F.3d at 813; *Fletcher*, 730 F.3d at 1210. The Court simply concludes that this duty extends to tribes—a position the Government itself took in previous litigation. *See Fletcher*, 730 F.3d at 121. Not only does this reading make the most sense of the statutory scheme, but it is also most consistent with the text. In any case, "doubtful expressions" in statutes passed to benefit Indian tribes must be "resolved in favor of the Indians." *See Alaska Pac. Fisheries Co. v. United States*, 248 U.S. 78, 89 (1918). So even if the Court were to find the scope of § 4011's accounting requirement ambiguous, it would construe it in the Nation's favor.

But just because § 4011 applies retrospectively does not mean that the Nation can demand an exhaustive accounting for its centuries-long trust relationship with the United States. Rather, § 4011 imposes two significant limitations on the subject matter and temporal scope of the Government's duty.

*First*, the Nation contends that § 4011 imposes a duty to account for the Nation's trust assets "without limitation"—from money, to fishing rights, to saline deposits. Compl. ¶ 135 n.6. But the text of § 4011 is not so sweeping: It requires the Secretary to account only for "the daily and annual balance of all *funds* . . . deposited or invested . . . ." (emphasis added). The term "fund" generally refers to "[a] sum of money or other liquid asset." *Fund*, Black's Law Dictionary (6th ed. 1990). And the plural "funds" can refer to "moneys and much more, such as nots bills, checks, drafts, stocks and bonds . . . and property of every kind." *Id*. Indeed, in the trust context, "funds" refers generally to "[t]he property held in a trust by a trustee," *Trust Fund*, Black's Law Dictionary (12th ed. 2024). So on first glance, the meaning of "funds" in § 4011 appears broad.

But § 4011's accounting requirement has another limitation. It applies only to "funds . . . *deposited or invested pursuant to section 162a of this title*." 25 U.S.C. § 4011(a) (emphasis added). And § 162a authorizes the Secretary to "withdraw from the United States Treasury and to deposit in banks . . . funds of any Indian tribe which are, or may hereafter be, held in trust by the United States." *Id*. § 162a(a). Taken together, §§ 4011 and 162a limit the scope of the Secretary's accounting obligation to financial assets, excluding real property and other assets that cannot be "deposited" in a bank. After all, "Section 162a(a) is simply and all about granting the Secretary of the Interior authority to invest monies belonging to Native American trust fund beneficiaries." *Fletcher*, 730 F.3d at 1211. And the specific requirements of § 162a(a) are

26

tailored to that purpose.  *See* 25 U.S.C. § 162a(a) (providing that "no individual Indian money shall be deposited in any bank" unless the bank pays a reasonable interest rate); *id*. (providing that "no tribal or individual Indian money shall be deposited in any bank" without proper collateral).

Similarly revealing is what § 162a(a) omits.  For all the talk of financial assets, § 162a stays silent on requirements for non-financial assets like mineral leases or other real property. The absence of any reference to non-monetary "funds" indicates that these assets fall outside the scope of the statute.  So by § 4011(a)'s plain terms, Congress imposed a continuing duty to account only on monetary assets.

The Magistrate Judge's Report concluded otherwise.  *See* R&R at 22–23.  It determined that § 4011's duty to account includes non-monetary assets because such assets would be included in a common law accounting.  *Id*.; *see also Cobell v. Kempthorne* (*Cobell XX*), 532 F. Supp. 2d 37, 99–100 (D.D.C. 2008) ("The requirement to include asset information in historical accounting statements is consistent with both the statute and the common law."), *vacated and remanded sub nom., Cobell XXII*, 573 F.3d at 808.  But the cases that the Report cites predate *Jicarilla*, which required specific statutory bases for the Government's fiduciary duties.  *See* 564 U.S. at 185.  Nor do those cases address § 4011's limited application to funds "deposited or invested pursuant to section 162a."  The Court therefore parts ways with the Report and concludes that § 4011's accounting requirement applies only to monetary assets.

*Second*, § 4011 imposes a time limit on the Secretary's duty to account.  Because the Secretary need only account for those funds deposited or invested under § 162a, 25 U.S.C. § 4011(a), she need not account for any funds deposited in any account before § 162a's enactment in 1938.

True, § 4011's text does not include an express 1938 cutoff.  But peel back one layer and the limitation becomes obvious.  Before 1938, all tribal trust funds were held by the U.S. Treasury and generally could not be "deposited or invested" in private banks.  *See Fletcher*, 730 F.3d at 1211–12.  So previously, there simply were no funds that were "deposited or invested" under § 162a.  Any reading of § 4011 that stretches back earlier than 1938 is in search of an empty set.  And if the temporal cut-off were not yet clear enough, the public law version of § 4011 directly references § 162a's enactment date, requiring the Secretary to account only for those funds "deposited or invested pursuant to the Act of June 24, 1938 (25 U.S.C. 162a)."  1994 Act, 108 Stat. 4239.  To read § 4011 as imposing a broad accounting remedy—say, one that goes back to "the earliest possible date," 25 U.S.C. § 4044(2)(A)—would cut against the grain of the text.  It thus comes as no surprise that the D.C. Circuit, despite taking a very broad reading of § 4011's accounting obligation, still limited its scope to "all funds . . . so long as they were deposited after the Act of June 24, 1938."  *Cobell VI*, 240 F.3d at 1102.

At this point, the scope of the Government's accounting obligations under §§ 4044 and 4011 come into focus.  Section 4044 imposed a one-time duty to provide a comprehensive reconciliation report to Congress and tribal trust beneficiaries.  Section 4011, meanwhile, imposes an ongoing duty to account to tribes and individual Indians—but only for monetary assets deposited in their trust accounts since 1938.

Now that the Court has determined what §§ 4044 and 4011 each require, it can assess whether the Government has satisfied its obligations, or whether any defenses—like the statute of limitations—apply.

**B.**

**1.**

Start with whether the Government has satisfied its duty under § 4044.  The Nation contends that the Anderson Report fell far short of the "full and complete" accounting that § 4044 required.  The Government, for its part, admits that the Anderson Report had shortcomings but contends that any challenges under § 4044 are time barred.  The Court agrees that the statute of limitations has run on the Nation's § 4044 claim, so the Secretary has no further duty to account under that provision.

Under 28 U.S.C. § 2401(a), claims against the United States are generally "barred unless the complaint is filed within six years after the right of action first accrues."  This section "generally applies to all civil actions whether legal, equitable, or mixed."  *Felter v. Kempthorne*, 473 F.3d 1255, 1259 (D.C. Cir. 2007) (cleaned up).  And a civil action typically "accrues" under § 2401(a) "when [it] come[s] into existence," *id*. (cleaned up), such that a party can "institute and maintain a suit in court," *Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 218 (D.C. Cir. 2013) (cleaned up).

The Government argues that the Nation's accounting claims based on the 1994 Act are time barred because the Nation did not bring them within six years of when the reconciliation reports were "deemed received."  *See* X-MSJ at 49.  The Nation disputes this framing.  It claims that actions against a trustee—including actions for an accounting—accrue only when the trustee has fully "repudiated" the trust relationship.  *See* Pl.'s Opp'n at 19–20.  Since the United States has not repudiated the trust, the Nation argues that its claims for a "full and complete" accounting under the 1994 Act are timely.

Under the common law of trusts, "the universal rule is that a statute of limitation does not begin to run where there is a fiduciary relationship between the parties until the relationship is repudiated." *Cobell XX*, 260 F. Supp. 2d at 105.  The trustee may repudiate by actions inconsistent with his responsibilities, such as "tak[ing] trust income for his own purposes," "set[ting] himself up as the owner of the trust principal" or, as alleged here, "declin[ing] to account to the beneficiary."  Bogert, *supra*, § 951.  Repudiation may also occur with express words.  *Jones v. United States*, 801 F.2d 1334, 1336 (Fed. Cir. 1986).  Either way, the statute of limitations will "not bar an equitable claim by a beneficiary against a trustee unless the trustee made a clear and continuing repudiation of the right of the beneficiary to enjoy the benefits of the trust." *Cobell XX*, 260 F. Supp. 2d at 105.

The Nation argues that this "universal rule" for private trusts ought to apply equally where the trustee is the United States.  *See* Pl.'s Reply at 20.  But transfer is not automatic. There are significant differences between the Government's fiduciary obligations and those of a private trustee.  A private trustee is subject to an inherent duty to account.  *See* Bogert, *supra*, § 968.  Yet the United States is subject to trust duties only "to the extent it expressly accepts those responsibilities by statute." *Jicarilla*, 564 U.S. at 185.  So while the Court may rely on background principles of trust law—like the repudiation rule—to "illuminate the meaning of a specific, applicable, trust-creating statute or regulation," these principles cannot "override" the language of statutes or regulations that define the Government's fiduciary obligations to a tribe. *Fletcher*, 730 F.3d at 1208.

The structure of § 4044 as well as later amendments addressing claim accrual under that section trump the traditional repudiation rule.

Consider § 4044's structure.  Recall that § 4044 required the Secretary to obtain "attestations" from tribal account holders that he "has provided the account holder with as full and complete accounting as possible."  25 U.S.C. § 4044.  The Secretary then had to report those attestations to Congress by May 1996.  In short, § 4044 imposed a one-time obligation to fully account, and it imposed a specific deadline by which the Secretary had to fulfill that obligation. If the Secretary failed to account by the required date, or if the Secretary did not provide a "full and complete accounting . . . to the earliest possible date," the tribes would be on notice of this fact no later than May 1996—but most likely earlier when the Secretary solicited their attestations.  *Id.*  Because of the one-time nature of this requirement, and the requirement that the Secretary disclose the results of the comprehensive accounting by a certain date, the Secretary's liability for failing to account under § 4044 became "fix[ed]" by 1996.  *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed. Cir. 1988).  At that point, the Nation was "entitle[d] . . . to institute an action."  *Id.*; *see also Impro Prods., Inc. v. Block*, 722 F.2d 845, 850 (D.C. Cir. 1983) (A "cause of action accrues when the 'right to resort to federal court is perfected.'").[3]

The common law repudiation requirement is tailored to a different set of circumstances. Unlike § 4044, the common law bestows an ongoing right to "compel the trustee to account in court."  Bogert, *supra*, § 968.  "Accordingly, [a private] trustee can be compelled by the court at any time to present an account in court, where it can be subject to scrutiny by the court, as well as to review by the beneficiary and other interested parties."  *Id.* § 966.  Because a beneficiary

---

[3]  For the Nation's challenge under the APA, its claim accrues upon final agency action.  *Impro Prod., Inc. v. Block*, 722 F.2d 845, 850 (D.C. Cir. 1983); *Worthington v. Off. of Nat'l Drug Control Pol'y*, 2020 WL 1509167, at *6 (D.D.C. Mar. 30, 2020).  In this case, that is the transmission of the Andersen Report.

can demand an accounting at *any time* during the life of the trust, a cause of action to account will not be "perfected" until the trustee repudiates that ongoing duty.

Bolstering this logic is the *trusting* nature of the trust relationship.  Trust beneficiaries are entitled "to rely upon the good faith and expertise of the trustee."  *Loudner v. United States*, 108 F.3d 896, 901 (8th Cir. 1997).  So "the beneficiary's duty to discover claims against the trustee is somewhat lessened."  *Id*.  Indeed, "[a] trusteeship would mean little if the [tribes] were required to supervise the day-to-day management of their estate by their trustee or else be precluded from recovery for mismanagement."  *United States v. Mitchell*, 463 U.S. 206, 227 (1983).

But again, this logic does not apply to § 4044.  The repudiation rule prevents malicious or incompetent trustees from swindling their beneficiaries and concealing their misdeeds until the limitations period expires.  But here, the Government was in no position to conceal its mismanagement to avoid an accounting.  Indeed, the ostensible purpose of § 4044 was to put to rest concerns about the Secretary's historical mismanagement of Indian trust funds.  It was on these grounds that § 4044 mandated a reconciliation, and it mandated that the Government provide the results to the tribes.  So unlike a typical common law beneficiary, the Nation had full access to the Secretary's accounting no later than 1996 and was in a perfect position to challenge the results of that accounting.

Nor does the repudiation rule fit with § 4044's requirement that the Secretary provide a one-off reconciliation report to *Congress*.  In a common law trust accounting, the primary interested party in the accounting is the trust beneficiary.  But here, Congress was the report's primary audience.  To read § 4044 as creating a cause of action that accrues only when the United States has repudiated its trust relationship would extend the scope of § 4044 far beyond its purpose of providing a reconciliation report to Congress by May 1996.  25 U.S.C. § 4044; *cf.*

*Jicarilla*, 564 U.S. at 175 (explaining that "the Government has often structured the trust relationship [with Indian tribes] to pursue its own policy goals").

On text and structure alone, the repudiation rule does not graft onto § 4044.  But any lingering doubts on this matter are put to rest by amendments to the provision that squarely address claim accrual and the statute of limitations.  In 2002, Congress passed an act amending § 4044 to extend the time by which tribes had to bring claims.  Act to Encourage the Negotiated Settlement of Tribal Claims, Pub. L. No. 107–153, 116 Stat. 79 (2002) (Settlement Act).  The Act established that,

> for purposes of determining the date on which an Indian tribe received a reconciliation report *for purposes of applying a statute of limitations*, any such report provided to or received by an Indian tribe in response to [25 U.S.C. § 4044] shall be deemed to have been received by the Indian tribe on December 31, 1999.

*Id.*

In its statement of purpose, the Settlement Act explained that the extension was "solely intended to provide recipients of reconciliation reports with the opportunity to postpone the filing of claims, or to facilitate the voluntary dismissal of claims, to encourage settlement negotiations with the United States."  *Id.*  Then in 2005, Congress added another year to the clock, establishing that the reconciliation reports should be "deemed . . . received" on December 31, 2000.  An Act To amend Public Law 107–153 to Modify a Certain Date, Pub. L. 109–158, 119 Stat. 2954 (2005).  Based on these provisions, tribes had until December 31, 2006, to file claims contesting the accounting required under § 4044.  *See Wyandot Nation of Kansas v. United States*, 124 Fed. Cl. 601, 602 (2016) (explaining that Congress required Indian tribes seeking a "full and complete accounting" under the 1994 Act to bring claims "within six years after the Government furnishes the accounting"), *aff'd*, 858 F.3d 1392 (Fed. Cir. 2017).

These amendments constitute further textual evidence that the traditional repudiation rule does not apply.  If the Court concluded that only repudiation could trigger the statute of limitations under § 4044, every Indian tribe with a trust account could (like the Nation does now) bring a suit demanding a full and complete accounting.  That would render the statute-of-limitations amendments superfluous.  The amendments give the tribes additional time—but not unlimited time—to bring their claims.  *Cf. Corley v. United States*, 556 U.S. 303, (2009) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (cleaned up)).

The Nation largely ignores the Government's arguments on the amendments to § 4044.  It asserts that its receipt of the Anderson Report could not trigger the statute of limitations for bringing an accounting claim because the Anderson Report did not constitute an accounting.[4]  Perhaps.  But the Secretary provided the Anderson Report to the Nation as required and obtained an "attestation" from the Nation that it needed more time for review.  Pl.'s Resp. ¶ 113.  If the Nation believed the Anderson Report was inadequate—so inadequate that it could not even be called an "accounting"—it was on notice that it had to bring its claims under § 4044 within six years of when Congress "deemed" that report "received."  Settlement Act, 116 Stat. 79.  So the limitations period for a § 4044 claim ran in December 2006.

Stepping back, one need only review previous congressionally mandated accountings to see that the repudiation rule is not so "universal" as the Nation claims.  The 1994 Act was not

---

[4]  The Court briefly discussed the repudiation rule in its order denying the Government's motion to dismiss, observing that there was "no suggestion that the Government has repudiated the trust" but also noting "the perils of deciding the statute of limitations in a motion to dismiss." *Cherokee Nation v. Dep't of the Interior*, No. 1:19-cv-02154 (TNM), 2020 WL 224486, at *3 (D.D.C. Jan. 15, 2020).  This limited gloss on the statute of limitations and the repudiation rule does not bind the Court on summary judgment.  Indeed, it specifically deferred the question for resolution now.

Congress's first attempt at resetting the trust relationship between the Nation and the federal government.  In 1893, Congress required the Secretary to "render a complete account of moneys due the Cherokee Nation" under several previously ratified treaties.  *Cherokee Nation*, 202 U.S. at 113 (quoting Act of March 3, 1893, 27 Stat. 612).  But Congress limited the time in which the Nation could challenge the accounting as "incorrect or unjust" to within a year of receiving it.  *Id*.  At other times, Congress did not mandate accountings but provided opportunities for tribes to open the Government's books and audit their accounts.  For example, the 1924 Act conferred jurisdiction on the Court of Claims to adjudicate "any and all legal and equitable claims arising under or growing out of any treaty or agreement between the United States and the Cherokee Indian Nation."  43 Stat. 27, 27–28.  But it required the Nation to bring its equitable claims— which would include a claim for an accounting—within five years of the date of the Act's approval.  *Id*.  The Court does not determine whether the Government properly accounted under these statutes.  But the statutes themselves aptly illustrate that Congress historically imposed accounting requirements with strict deadlines for tribal challenges.

Section 4044 required the Secretary to provide the Nation a "full and complete accounting."  To fulfill this requirement, the Secretary commissioned the Anderson Report.  The Nation told the Secretary it would review the report but never followed up.  And now the Nation claims the Secretary never performed its duty to account under § 4044.  Those claims are time barred.  So the Nation cannot now demand "full and complete accounting . . . to the earliest date possible" for all the assets held in trust by the Government.  25 U.S.C. § 4044(2)(A).[5]

---

[5]  The Magistrate Judge's Report concluded that the Nation's § 4044 claim was not time barred and proceeded to find that the Anderson Report failed to satisfy the Secretary's accounting obligations, making it arbitrary and capricious.  Because the Court concludes that any challenge to the Anderson Report is indeed time barred, it need not address whether the Anderson Report satisfied § 4044 on the merits.

**2.**

Turn now to whether the Secretary fulfilled her accounting obligations under § 4011. The Government argues that whether its duty arises under §§ 4011 or 4044, the Nation's claims for an accounting going back to the 1800s have long gone stale. But that is not quite right. Unlike § 4044, § 4011 imposes an ongoing duty much like a private trustee's duty to account under the common law. The main difference, of course, is the narrow class of assets for which the Secretary must account: monetary assets deposited in trust after 1938.

As with § 4044, the Government argues that any duty to account under § 4011 is time barred following the Anderson Report. But this view ignores important differences between §§ 4011 and 4044. Many of these the Court has teased out already.

*First*, § 4011 tracks the continuing obligation to account under the common law. So it is appropriate for the Court to rely on "traditional adjudicatory principles found in trust law," *Fletcher*, 730 F.3d at 1208, like the repudiation rule. Unlike § 4044, where Congress clarified that claims accrued when the reports were "deemed . . . received," there is no textual basis in § 4011 for displacing or overriding the common-law rule. Section 4011(a) does not impose a specific deadline for filing claims. And § 4011(b) and (c) impose ongoing duties, requiring annual statements of performance and audits. All of this suggests that traditional trust principles are "consistent with [§ 4011] and help illuminate its meaning." *Fletcher*, 730 F.3d at 1210.

*Second*, the limited case law on this question supports applying the repudiation rule. In *Cobell XX*, Judge Lamberth held that the statute of limitations could not bar a claim for an accounting under § 4011. 260 F. Supp. 2d at 105–110. Plaintiffs in that case sought a declaratory judgment spelling out the Secretary's fiduciary obligations, "including a finding that defendants were required to provide a complete historical accounting of [individual Indian]

36

accounts." *Id*. at 108.  Judge Lamberth found that this claim did not "accrue" until the Secretary

"repudiated the beneficiary's right to the benefits of the trust."  *Id*. at 105.  *Cobell XX* is not

binding precedent.  But it addresses similar circumstances, and the Court finds it persuasive.

At this point, the Government retreats, arguing that it did, in fact, repudiate its trust

relationship with the Nation by delivering a deficient accounting in the Anderson Report.  Defs.'

Objs. at 15–19.  In making this argument, the Government seemingly asks the Court to believe

that the Anderson Report was so deficient to trigger the statute of limitations as a breach of trust

duty yet adequate to meet the Government's statutory obligations to account.  As the Magistrate

Judge's Report put it, "[t]his strains credulity."  R&R at 17.  But even setting aside the

Government's contradictory assertions, the Court finds that the Anderson Report did not amount

to "a *clear and continuing* repudiation of the right of the beneficiary to enjoy the benefits of the

trust." *Cobell XX*, 260 F. Supp. 2d at 106 (citing *Kosty v. Lewis*, 319 F.2d 744, 750 (D.C. Cir.

1963)).  Deficient or not, the Anderson Report does not run the statute of limitations for a § 4011

claim.

The Government also argues that the Nation's demand for an accounting is claim

precluded or judicially estopped based on an 1893 accounting and court cases brought under the

Indian Claims Commission Act.  *See* Defs.' X-MSJ at 32–45.  The Magistrate Judge's Report

rejected these arguments, concluding that there was a genuine dispute of material fact as to

whether the Nation had a "fair opportunity" to object to the results of earlier accountings or bring

claims for mismanaged funds.  *See* R&R at 23–27.  The Government does not object to the

Report's conclusion on this issue.  *See* Defs.' Objs. at 44.  So for purposes of summary

judgment, the Court finds that the Nation has raised substantial doubts as to whether coercive

and oppressive acts by the federal government precluded tribal leaders from raising meaningful objections to previous accountings.

At any rate, past accountings have limited bearing on whether the Secretary has fulfilled her ongoing duty to account under § 4011.  That section requires the Secretary to retrospectively account for funds deposited after 1938, so any accounting before that date will only be relevant as much as it establishes a baseline of assets included in the trust.  And later accountings, though they may not be preclusive, could serve as a starting point for the Government's further accounting efforts if the Court finds that equity does not require that they be redone.

Because § 4011 imposes an ongoing duty to account, and the Nation has timely sued to enforce that duty, the Court will deny the Government's motion for summary judgment on Count II.

## C.

Besides its statutory claims under §§ 4011 and 4044, the Nation contends the Secretary violated the APA in failing to provide an adequate accounting.  The Court characterized this claim as a failure-to-act claim under § 706(1).  *See Cherokee Nation*, 2020 WL 224486, at *3.  A § 706(1) claim "can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take."  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63–64 (2004).  In other words, the Nation must show that the Secretary is subject to a "legal duty" that is "ministerial or nondiscretionary" and amounts to "a specific, unequivocal command."  *W. Org. of Res. Councils v. Zinke*, 892 F.3d 1234, 1241 (D.C. Cir. 2018) (cleaned up).

Both §§ 4011 and 4044 impose discrete, nondiscretionary duties under § 706(1).  *See Cobell VI*, 240 F.3d at 1095.  But the Nation cannot bring a failure-to-act claim based on § 4044 because Interior took final agency action when it transmitted the Anderson Report to the tribes

38

and then to Congress.  After all, the Anderson Report "mark[ed] the consummation" of the

Secretary's decisionmaking process for purposes of § 4044.  *Bennett v. Spear*, 520 U.S. 154, 178

(1997).  And delivering the Anderson Report to the Nation was the act by which the Nation's

"rights or obligations [were] determined, [and] from which legal consequences [] flow[ed]."  *Id*.

      As to § 4011, the Nation has not alleged that the Government failed to perform a

mandatory duty that would trigger an action under § 706(1).  True, there are some actions that

the Secretary must automatically take under § 4011.  She must provide periodic "statement[s] of

performance" and "conduct[] an annual audit . . . of all funds held in trust."  25 U.S.C. § 4011(b),

(c).  The Nation does not allege that the Secretary refused these duties.

      Section 4011 also obligates the Secretary to "account" to its beneficiaries.  *Id*. § 4011(a).

Of course, the Court now holds that the Nation has a standalone cause of action under § 4011.

This displaces any remedy under the APA.  *See Citizens for Resp. & Ethics in Washington v.

DOJ*, 846 F.3d 1235, 1244-45 (D.C. Cir. 2017) (APA relief is precluded "where Congress has

provided an independent cause of action or an alternative review procedure.").  In any case, the

Nation need not bring its claim under § 706(1) to obtain relief.  And since the summary judgment

standard applies to the Nation's § 4011 claim, the Court need not analyze it under the more

deferential arbitrary and capricious standard at this stage.  So the Court will deny summary

judgment on Count III as it pertains to any § 706(1) claim arising out of § 4011.

## D.

      The Court has defined the Government's accounting duties.  So what comes next?  At

this point, the Court need not decide the precise contours of any accounting remedy as the Nation

moved only for summary judgment on whether the Government's past accountings satisfied its

obligations.  Still, the Court notes that the accounting called for by § 4011 cannot be as broad as

the "full and complete" accounting required by § 4044.  And working within § 4011's textual

constraints, *see supra* Section III.A.2.b., the Court "possesses considerable discretion 'to mould'

the nature and scope of the accounting 'to the necessities of the particular case.'"  *Fletcher*, 730

F.3d at 1214 (quoting *Cobell XXII*, 573 F.3d at 813); *cf.* Bogert, *supra*, § 968 (explaining that

"the appropriate form for a trustee's account will vary from jurisdiction to jurisdiction and from

trust to trust").

      Section 162a(d) explains how to execute § 4011's duty to account.  It notes that the

"proper discharge" of the Secretary's trust responsibilities includes "but [is] not limited to"

providing "adequate systems for accounting," "adequate controls over receipts and

disbursements," "timely reconciliations to assure the accuracy of accounts," and "periodic

statements of . . . account performance," among other things.  25 U.S.C. § 162a(d)(1)–(3), (5).

These guidelines do not "establish[] [a] specific fiduciary duty," *El Paso Nat. Gas Co.*, 750 F.3d

at 895, so they are not actionable on their own.  Still, § 162a(d) is relevant to the scope of § 4011

because it "lists some of the means through which the Secretary shall discharge" its trust

obligations, *Cobell VI*, 240 F.3d at 1101, and "speak[s] directly to traditional trust duties,

including the duty to account," *Fletcher*, 730 F.3d at 1212.

      At bottom, the Court's "overarching aim" is for the Secretary to "provide the trust

beneficiaries the best accounting possible, in a reasonable time, with the money that Congress is

willing to appropriate."  *Cobell XXII*, 573 F.3d at 813.  To achieve this aim, "the court may focus

the inquiry in ways designed to get the plaintiffs what they need most without imposing

gratuitous costs on the government."  *Fletcher*, 730 F.3d at 1214.  For example, the Secretary

might use "statistical sampling" to verify transactions if a line-by-line accounting would be too

expensive.  Similarly, the Court could determine that, for § 4011's more limited purposes, the

Anderson Report provides an adequate baseline accounting that the Government could supplement to fulfill its obligations.  As then-Judge Gorsuch explained, nothing in § 4011 suggests that the Secretary must do a "green eye-shade death march through every line of every account over the last one hundred years." *Fletcher*, 730 F.3d at 1214.  A review and update of the Anderson Report may be sufficient to satisfy § 4011's limited duty.

*     *     *

This memorandum seeks to resolve the parties' arguments over the scope of the Secretary's accounting obligations under federal law.  The Nation's claims for a "full and complete" accounting under § 4044 are time barred.  This leaves the Nation with a more limited but important right to an accounting under § 4011.  Now that the Court has clarified the operative legal framework, it expects the parties to cooperate on next steps to ensure the Nation receives its accounting within a realistic timeframe and scope, given the Government's other obligations and limitations.

**IV.**

For these reasons, Plaintiff's [88] Motion for Partial Summary Judgment is GRANTED, and Defendants' [96] Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.  Count I and Count III of the Complaint are dismissed.  Plaintiff's [98] Rule 56(d) Motion is DENIED AS MOOT.

Dated: September 25, 2024                          TREVOR N. McFADDEN, U.S.D.J.